ATELIER CONSTANTIN POPESCU, LLC *v.*
JC CORPORATION ET AL.
(AC 31951)

Bear, Espinosa and Dupont, Js.

732

Argued November 17, 2011—officially released April 17, 2012

*John F. Carberry*, with whom, on the brief, was *David T. Martin*, for the appellants (defendants).

*Eric D. Grayson*, for the appellee (plaintiff).

ESPINOSA, J. The defendants, JC Corporation, Tea House on the Riverside, Inc. (Tea House), Julie Chen and Hsiao-Wen Chen, appeal from the judgment of the trial court finding them liable for damages incurred by the plaintiff, Atelier Constantin Popescu, LLC, as a result of a fire that destroyed the building that JC Corporation had agreed to lease to the plaintiff. The defendants claim that the court improperly found that (1) JC Corporation's independent contractor acted with gross negligence in causing the fire that destroyed the building; (2) the gross negligence of the independent contractor could be imputed to the defendants; (3) the defendants acted recklessly; (4) the corporate veils of JC Corporation and Tea House could be pierced; and (5) the plaintiff was entitled to prejudgment interest under General Statutes § 37-3a.[1] We affirm the judgment of the trial court.

The following facts as found by the trial court are relevant to our consideration of this appeal. The plaintiff is a Connecticut corporation in the business of renting, selling and repairing classical stringed instruments, as well as providing music lessons. The corporation has two members, Constantin Popescu and Rodica Brune, who formed the corporation in 1997. In 2006, the plaintiff needed a new space for its business, as its existing

---

[1] Additionally, the defendants claim that the court improperly awarded the plaintiff attorney's fees on the basis of its erroneous findings in favor of the plaintiff on its claims of negligence, recklessness and piercing the corporate veil. Because we affirm the judgment of the court with respect to these claims, the defendants' argument regarding attorney's fees must fail.

lease was set to expire. In a discussion with the plaintiff's real estate broker, Brune expressed interest in a building located at 1076 East Putnam Avenue in Riverside that she had seen with a sign that read, "Tea House on the Riverside—Coming Soon." Brune had driven past this building many times over the past two years, and the tea house had never opened. The real estate broker arranged a meeting between Brune, Popescu and the owners of 1076 East Putnam Avenue.

Sometime in May, 2006, Popescu and Brune met with Hsiao-Wen Chen, Hsiao-Wen Chen's husband and Julie Chen, their daughter, to discuss a potential lease agreement. At this meeting, the Chens explained that they had been trying, without success, for approximately three years to obtain the permits necessary to open a tea house at 1076 East Putnam Avenue. Having grown frustrated with the process, the Chens stated that, instead, they would be willing to lease the premises to the plaintiff. Brune believed that 1076 East Putnam Avenue was an ideal location because the Chens had made a number of improvements, including the creation of a new bar that could be used for a counter, new shelving that could serve as storage and new bathrooms and other facilities that increased the value of the property.

Shortly after the meeting, the Chens notified the plaintiff that they were willing to lease the entire building for a monthly rent of approximately $13,000. The Chens also requested $150,000 in "key money," which the real estate agent explained was a payment to reimburse the Chens for the improvements made to the building. Although Brune thought that this key money payment was too high, she believed that the improvements were beneficial and would allow the plaintiff to move into the building without further renovation.

On May 25, 2006, the plaintiff submitted its first offer. The offer listed "JC Corporation," the owner of record

of 1076 East Putnam Avenue, as the landlord, and proposed, among other terms, a key money payment of $100,000 payable to the landlord upon signing of the lease. On May 29, 2006, Julie Chen, who was the vice president and secretary of JC Corporation and the sole individual in charge of JC Corporation's daily operations, wrote, in response to this offer: "Key Money: $150,000. Over the weekend, we spoke with the Tea House principals and considering their substantial investment (more than $300,000) they put into renovating the space, they need significantly more than $100,000 to relinquish the space." The letter ended by stating: "If the terms and conditions presented herein are acceptable, we would be happy to proceed with preparing the lease." On June 1, 2006, the plaintiff sent Julie Chen a letter confirming the agreed to terms and conditions for the lease. The proposed agreement set the key money payment at $110,000.

On June 20, 2006, JC Corporation sent the first draft of the lease to the plaintiff. JC Corporation also sent a draft of an agreement, referred to by the parties during the course of this litigation as the "key money agreement," that named Tea House as the owner of the improvements made to the building and the recipient of the key money payment. The plaintiff was "completely surprised" by both the key money agreement and the interjection into the transaction of the third party, Tea House, which previously had not appeared in any of the draft agreements. When Brune asked Julie Chen to explain what Tea House was and why there was a need for a separate key money agreement, Julie Chen responded that it was a "technicality" and that it was "none of her business."

On September 19, 2006, the parties executed a lease for the premises at 1076 East Putnam Avenue, with the term set to begin on October 1, 2006. The plaintiff made the first two of three $11,500 installment payments of

the security deposit on September 19, 2006, and October 3, 2006. The parties executed the key money agreement on September 19, 2006, and the plaintiff delivered a check to Hsiao-Wen Chen for $110,000, made payable to Tea House.

On October 6, 2006, a fire at 1076 East Putnam Avenue essentially destroyed the building. On December 12, 2006, pursuant to language in the lease giving the plaintiff the option of terminating the lease if JC Corporation did not substantially restore the premises within 120 days of a fire or other loss, the plaintiff sent JC Corporation a valid notice of termination of the lease.[2] Despite this notice, on December 27, 2006, the defendants sent the plaintiff a letter stating that they were not returning the key money payment and that JC Corporation was making a deduction of $3175 from the security deposit, allegedly for one-half of the costs associated with landscaping work completed on the property in connection with the lease. On January 5, 2007, Hsiao-Wen Chen wrote out a check from the Tea House bank account in the amount of $110,000, made payable to herself, and wrote on it, "return of capital." Hsiao-Wen Chen admitted that this represented the key money payment.

The plaintiff filed its initial complaint on June 4, 2007. The plaintiff later revised and amended its complaint several times. The plaintiff filed the operative complaint in this case, its fifth amended revised complaint, on July 14, 2009. Its eleven counts were as follows: (1) breach of lease, (2) negligence, (3) recklessness, (4) wilful and wanton misconduct, (5) unjust enrichment, (6) equitable forfeiture, (7) piercing the corporate veil as to JC Corporation, (8) piercing the corporate veil as to Tea House, (9) failure to return the plaintiff's security

---

[2] It was undisputed that the premises would not be substantially restored, within the meaning of the lease, by February 6, 2007, 120 days from the date of the fire.

deposit in violation of General Statutes § 47a-21, (10) violations of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., and (11) restitution.

On December 14, 2009, following a trial to the court, the court filed a memorandum of decision. The court found in favor of the plaintiff on five of the eleven counts in the complaint: breach of lease, negligence, recklessness and piercing the corporate veil as to both JC Corporation and Tea House.[3] The court rendered judgment in favor of the plaintiff in the amount of $204,406.79, representing the key money, security deposit, litigation costs and $50,000 in attorney's fees.[4]

The defendants appealed to this court on February 4, 2010. On February 16, 2010, the defendants filed a motion for articulation, which the trial court denied on June 2, 2010. The defendants filed a motion for review, and this court granted review and granted the relief requested, directing the trial court to articulate the factual and legal bases of several of its findings. The trial court issued its articulation on November 29, 2010. Additional facts will be set forth as necessary.

I

GROSS NEGLIGENCE

The court found, and the parties do not dispute, that clause 29 is the dispositive lease provision that details

---

[3] On February 16, 2010, the plaintiff cross appealed from the court's findings on the remaining counts of its complaint. The plaintiff withdrew this cross appeal on June 15, 2010.

[4] The court did not address explicitly the plaintiff's restitution claim. Nevertheless, we conclude that the present appeal was taken from a final judgment. "Although it is preferable for a trial court to make a formal ruling on each count, we will not elevate form over substance when it is apparent from the memorandum of decision that the trial court found in favor of the plaintiff . . . ." *Rent-A-PC, Inc.* v. *Rental Management, Inc.*, 96 Conn. App. 600, 604 n.3, 901 A.2d 720 (2006). In the present case, the court, relying upon several of the plaintiff's claims, rendered judgment in favor of the plaintiff and awarded it damages. Thus, the rights of the parties were concluded, and the appeal was taken from a final judgment.

when JC Corporation may be held liable for consequential damages under the lease. Clause 29 provides in relevant part: "Notwithstanding anything in the Lease herein to the contrary, [JC Corporation] shall in no event be charged with or liable for any consequential damages suffered by [the plaintiff] as a result of [JC Corporation's] failure to perform any of its obligations under this Lease, provided however, that if, due to [JC Corporation's] gross negligence or willful misconduct, [the plaintiff] is prevented from taking initial possession of the premises under this Lease, then this limitation shall not preclude [the plaintiff] from seeking recovery of any sums paid by [the plaintiff], with [JC Corporation's] knowledge, to acquire the right to enter into this lease; following [the plaintiff's] taking possession of the premises, such sums shall not be recoverable against [JC Corporation]."

There is no dispute that the plaintiff was prevented from taking initial possession of the premises. Furthermore, the court found that JC Corporation did not engage in wilful misconduct, and the plaintiff does not challenge this determination on appeal. Therefore, the resolution of this appeal hinges on the question of whether the plaintiff was prevented from taking initial possession of the premises due to gross negligence on the part of JC Corporation.

The court determined that JC Corporation's independent contractor was grossly negligent and that JC Corporation was vicariously liable for this gross negligence. The defendants assert that each of these findings was improper. We address each claim in turn.

A

Interstate Fire Safety and Equipment

First, the defendants claim that the court improperly found that their independent contractor acted with

gross negligence in causing the fire that destroyed the building. They argue that the court's findings do not support even a finding of ordinary negligence. According to the defendants, use of a plasma cutter in proximity to combustibles that were "concealed" cannot support a finding of gross negligence because the combustibles necessarily were not visibly apparent or identifiable. We disagree.

The following additional, undisputed facts are relevant. After an inspection showed that the building required various repairs, JC Corporation retained Interstate Fire Safety and Equipment (Interstate) to complete some of the necessary work. William Barnes, Interstate's owner, testified that Interstate was hired only to remove a stove ventilation hood in the first floor kitchen and to disarm the fire suppression system for the ventilation hood. This ventilation hood was connected to the ceiling by four metal rods and was vented through the roof of the building via ductwork that ran from the hood, through the ceiling and eventually out through the roof.

Barnes testified that Interstate previously had performed work on this ventilation system. In 2005, Hsiao-Wen Chen, acting on behalf of Tea House, retained Interstate to make repairs to the ventilation hood to bring it into compliance with certain building codes. As installed, the ventilation hood and parts of the ductwork were too close to the wooden frame construction of the building, which, in the terms of the relevant building codes, were considered "concealed combustibles." Interstate made repairs to the hood and the ductwork to bring the ventilation system into compliance. These repairs required Interstate to detach the hood from the ductwork and then to remove the Sheetrock ceiling to expose the combustibles. Interstate wrapped the ductwork in fire resistant material to protect the combustibles and reattached the hood to the ductwork, bringing the system into compliance with the building codes.

Interstate was contacted to work on this same ventilation system in connection with JC Corporation's lease agreement with the plaintiff. Barnes testified that he spoke to Julie Chen on the telephone regarding the work that Interstate was to perform. According to Barnes, he was "adamant" about the fact that Interstate would only remove the ventilation hood and would not remove the ductwork. Barnes explained to Julie Chen that Interstate would not remove the ductwork because of safety concerns, namely, the risk of fire if the ductwork was removed without first removing the ceiling. On October 6, 2006, Barnes dispatched a crew of four Interstate employees to 1076 East Putnam Avenue. Barnes gave the crew specific instructions to detach only the ventilation hood from the ductwork and to disarm the ventilation hood's fire suppression system.

The court found that, after Interstate had performed this work, Julie Chen disregarded Barnes' warnings about the fire risk associated with removing the ductwork and instructed the Interstate employees to remove the ductwork by cutting it flush to the ceiling. The employees followed this instruction. They performed the work using a plasma cutter, a tool that cuts through steel by creating temperatures in excess of 10,000 degrees Fahrenheit.

Regarding this use of a plasma cutter in proximity to concealed combustibles, the court credited the testimony of an expert witness for the plaintiff, who opined that "[Interstate's] decision to satisfy [Julie Chen's] request to trim the ductwork as instructed, and by using a plasma cutter to do so, without taking any precautions to prevent a fire from occurring, showed a total disregard for all industry standards and laws related to this type of operation." On the basis of the evidence before it, the court determined that Interstate's actions amounted to gross negligence.

"[T]he conclusion of negligence is necessarily one of fact . . . . Accordingly, the court's finding of negligence will be upheld unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence . . . we give great deference to its findings." (Citations omitted; internal quotation marks omitted.) *Twin Oaks Condominium Assn., Inc.* v. *Jones,* 132 Conn. App. 8, 11–12, 30 A.3d 7 (2011).

Our Supreme Court has stated that gross negligence is "very great or excessive negligence, or as the want of, or failure to exercise, even slight or scant care or slight diligence . . . . [T]his court has construed gross negligence to mean no care at all, or the omission of such care which even the most inattentive and thoughtless seldom fail to make their concern, evincing a reckless temperament and lack of care, practically [wilful] in its nature . . . . Gross negligence means more than momentary thoughtlessness, inadvertence or error of judgment; hence, it requires proof of something more than the lack of ordinary care. It implies an extreme departure from the ordinary standard of care, aggravated disregard for the rights and safety of others, or negligence substantially and appreciably greater than ordinary negligence." (Citations omitted; internal quotation marks omitted.) *19 Perry Street, LLC* v. *Unionville Water Co.,* 294 Conn. 611, 631 n.11, 987 A.2d 1009 (2010).

We conclude that the court's finding of gross negligence is not clearly erroneous. The court carefully considered the evidence before it, including the testimony of several individuals familiar with the dangers involved with the use of a plasma cutter. It was within the province of the court to credit the expert testimony that

Interstate's actions demonstrated a total disregard for all industry standards, and, from this, to find that Interstate's actions amounted to "an extreme departure from the ordinary standard of care . . . ." (Internal quotation marks omitted.) Id.

We are not persuaded by the defendants' argument that Interstate was unaware of the concealed combustibles and therefore did not recognize the risks associated with using a plasma cutter to remove the ductwork. To the contrary, as the court found, Barnes testified that he cautioned Julie Chen that cutting the ductwork flush to the ceiling would pose a safety risk; specifically, a fire risk. Interstate clearly was aware of the dangers posed by using a plasma cutter in these circumstances and proceeded to remove the ductwork despite these dangers.[5]

B

## JC Corporation

Next, the defendants claim that, even if Interstate's actions amounted to gross negligence, the court improperly held JC Corporation vicariously liable for Interstate's actions.[6] The defendants assert that, generally, an employer is not liable for the negligence of its

[5] There is no dispute that Barnes was an agent of Interstate acting within the scope of his authority. "[K]nowledge of . . . an agent while acting within the scope of his authority and in reference to a matter over which his authority extends is . . . knowledge of . . . the principal . . . ." (Citation omitted; internal quotation marks omitted.) *Updike, Kelly & Spellacy, P.C.* v. *Beckett,* 269 Conn. 613, 638 n.20, 850 A.2d 145 (2004). Therefore, Barnes' knowledge of the risk posed by cutting the ductwork flush to the ceiling reasonably may be imputed to Interstate.

[6] Additionally, the defendants claim that the court improperly held Julie Chen vicariously liable for Interstate's gross negligence. The defendants argue that the plaintiff had a contract with JC Corporation, not Julie Chen, and that Julie Chen had no legal relationship with Interstate in her individual capacity. Accordingly, the defendants assert that she may not be held vicariously liable for Interstate's gross negligence. Our resolution of this claim depends on whether the court properly pierced the corporate veil of JC Corporation. As discussed in part III A of this opinion, we conclude that it did.

independent contractors. According to the defendants, the court improperly found JC Corporation liable for Interstate's gross negligence under three separate exceptions to this general rule. We disagree.

"[T]he scope of our appellate review depends [on] the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Fisher* v. *Big Y Foods, Inc.*, 298 Conn. 414, 423–24, 3 A.3d 919 (2010). Therefore, whether the defendants can be held vicariously liable for the actions of Interstate is a question of law over which our review is plenary. To the extent that the defendants challenge the court's underlying factual findings that support its legal conclusion of vicarious liability, we consider whether such factual findings are clearly erroneous.

"[U]nder the general rule, an employer is not liable for the negligence of its independent contractors." (Internal quotation marks omitted.) *Machado* v. *Hartford*, 292 Conn. 364, 371, 972 A.2d 724 (2009). There are, however, several exceptions to this general rule, including "when the [employer] retains control of the premises or supervises the [independent contractor's] work, when the work is inherently dangerous, or when the [employer] has a nondelegable duty to take safety precautions imposed by statute or regulation." *Pelletier* v. *Sordoni/Skanska Construction Co.*, 264 Conn. 509, 528, 825 A.2d 72 (2003).

Therefore, Julie Chen is vicariously liable for Interstate's gross negligence to the same extent as is JC Corporation.

The court found that JC Corporation was vicariously liable for Interstate's gross negligence under each of these three exceptions. The defendants claim that none of these exceptions is applied appropriately in the present case. Although a finding that one exception applies is sufficient to hold JC Corporation vicariously liable, we address in turn the court's determination with respect to each exception.

1

Retaining Control or Supervising

The defendants claim that Julie Chen, acting as JC Corporation's agent,[7] did not retain control of the premises or supervise Interstate's work such that JC Corporation may be held vicariously liable for Interstate's gross negligence. In support of their argument, the defendants cite Julie Chen's testimony that she did not ask Interstate to cut the ductwork flush to the ceiling; rather, Interstate offered to do so when she asked if Interstate could push the ductwork into the ceiling. The defendants assert that, ultimately, she left the decision to Interstate and that she did not exercise control to a degree sufficient to hold JC Corporation vicariously liable. We disagree.

Our Supreme Court frequently has turned to the Restatement (Second) of Torts when describing exceptions to the general rule of employer nonliability. See, e.g., *Pelletier* v. *Sordoni/Skanska Construction Co.*, 286 Conn. 563, 597–98, 945 A.2d 388 (2008). Sections 410 to 429 of the Restatement (Second) of Torts describe these various exceptions. In particular, § 410 pertains to situations in which an employer exercises control over the work of the independent contractor. Section

---

[7] The court found, and the defendants do not dispute, that Julie Chen was the vice president of JC Corporation and, at all times relevant to the present case, acted as its agent.

410 provides: "The employer of an independent contractor is subject to the same liability for physical harm caused by an act or omission committed by the contractor pursuant to orders or directions negligently given by the employer, as though the act or omission were that of the employer himself." 2 Restatement (Second), Torts § 410 (1965).

We conclude that JC Corporation clearly may be held vicariously liable on the basis of its instructions to Interstate, given through its agent, Julie Chen, to cut the ductwork flush to the ceiling. The court found that Julie Chen instructed Interstate to perform this work and that Barnes previously had cautioned her that such work would pose an unacceptable fire risk. On the basis of this finding, the court reasonably decided that JC Corporation, through its agent, supervised the work of the contractor. We agree and conclude that JC Corporation may be held vicariously liable on this ground.

To the extent that the defendants assert that there were no facts in the record to establish that Julie Chen instructed Interstate to perform the work, the defendants challenge the court's findings of fact, rather than its legal conclusions. "[T]he court, in its role as finder of fact, [is] the sole arbiter of the credibility of the witnesses and the weight to afford their testimony . . . ." (Citation omitted; internal quotation marks omitted.) *Crespo* v. *Commissioner of Correction*, 292 Conn. 804, 810 n.5, 975 A.2d 42 (2009). The defendants offer no reason why it was clearly erroneous for the trial court not to credit Julie Chen's testimony. One of the Interstate employees who removed the ductwork stated in a deposition, the transcript of which was before the court, that Julie Chen instructed him to remove the ductwork and, furthermore, that she was "persistent" in so instructing him. In light of this conflicting evidence, the court was free to conclude that Julie Chen's testimony was not credible.

2

### Inherently Dangerous Work

Next, the defendants claim that the use of a plasma cutter is not inherently dangerous and, therefore, that the court improperly found JC Corporation vicariously liable for Interstate's gross negligence. The defendants assert that, if used properly, a plasma cutter is not dangerous and that it was Interstate's misuse of the plasma cutter that created the risk of fire. According to the defendants, only activities that expose others to probable injury even if performed correctly may be regarded as "inherently dangerous." Furthermore, they posit that, in Connecticut, courts have limited "inherently dangerous" activities for purposes of vicarious liability to blasting, pile driving and the use of volatile chemicals. We do not agree.

Our Supreme Court has explained that "[w]here a party contracts for work to be done of such a character that, even if the work is duly performed, it would naturally, if not necessarily, expose others to probable injury unless preventive measures are taken by him, he is liable for that injury if, while chargeable with knowledge that the work is of such a character, he negligently fails to take preventive measures." (Internal quotation marks omitted.) *Pelletier* v. *Sordoni/Skanska Construction Co.*, supra, 286 Conn. 597. In *Pelletier* v. *Sordoni/Skanska Construction Co.*, supra, 597–98, our Supreme Court cited with approval § 413 of the Restatement (Second) of Torts, which provides: "One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer (a) fails to provide in the contract that the contractor shall

take such precautions, or (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions." 2 Restatement (Second), supra, § 413.

In *Pelletier* v. *Sordoni/Skanska Construction Co.*, supra, 286 Conn. 598, our Supreme Court held that, as a matter of law, welding is not an inherently dangerous activity, stating: "[T]he fabrication and inspection of welds is not the kind of work that, when properly done, naturally would expose others to injury unless special preventive measures were taken. It is only when a weld is not fabricated and inspected properly because the fabricator or inspector failed to take ordinary or routine precautions that others may be exposed to danger, as happened in this case."

As an initial matter, we reject the defendants' assertion that only blasting, pile driving and the use of volatile chemicals can rise to the level of inherently dangerous activities. Clearly, our Supreme Court has endorsed a test that considers activities on a case-by-case basis, taking into account the nature of the activity and whether it would expose others to probable injury even if properly performed.

In the present case, we conclude that, as a matter of law, Interstate's use of a plasma cutter to cut the ductwork flush to the ceiling without first removing the ceiling to expose the combustibles was inherently dangerous. The trial court found, and the defendants do not dispute, that cutting the ductwork flush to the ceiling without first removing the ceiling created a high probability that a fire would occur. The defendants' argument that, *if* the ceiling had been removed and the combustibles had been covered, the probability of fire would have been greatly reduced, is inapposite. Julie Chen specifically instructed Interstate not to remove the ceiling. The defendants may not now claim that,

had JC Corporation contracted for something other than what they actually requested, the risk of injury would have been substantially less. *Pelletier* v. *Sordoni/ Skanska Construction Co.*, supra, 286 Conn. 563, would have been dispositive of the issue before this court had Julie Chen merely requested that the ductwork be removed and had Interstate then failed to take ordinary or routine precautions. Julie Chen requested, however, that the ceiling be left in place, and, as a result, the contracted for activity naturally exposed others to probable injury by creating a high probability of a fire. Therefore, we agree with the court that the contracted for activity was inherently dangerous and that JC Corporation is vicariously liable for the damages caused.

3

Nondelegable Duty to Take Safety Precautions

Finally, the defendants claim that the court improperly determined that JC Corporation owed the plaintiff a nondelegable duty to keep the premises safe and, consequently, held that JC Corporation was vicariously liable for Interstate's gross negligence. The defendants assert that, because the work performed by Interstate required that Interstate possess a special license, JC Corporation had a duty to delegate the work to Interstate. Furthermore, the defendants contend that extending the nondelegable duty doctrine to benefit the plaintiff is unwarranted, given that the plaintiff was not an invitee and was not present on the property at the time of the fire. In response, the plaintiff argues that, although JC Corporation was required by law to delegate the performance of this work, its lease with the plaintiff imposed upon it the duty to exercise ordinary care to protect the plaintiff's interests in the property. We agree with the plaintiff.

"One exception to this general rule [of employer nonliability] . . . is that the owner or occupier of premises

owes invitees a nondelegable duty to exercise ordinary care for the safety of such persons. . . . The nondelegable duty doctrine is, therefore, an exception to the rule that an employer may not be held liable for the torts of its independent contractors. . . . Nondelegable duties create a form of vicarious liability. . . . In vicarious liability situations, the law has . . . broaden[ed] the liability for that fault by imposing it upon an additional, albeit innocent, defendant . . . namely, the party that has the nondelegable duty." (Citations omitted; internal quotation marks omitted.) *Gazo* v. *Stamford*, 255 Conn. 245, 257, 765 A.2d 505 (2001).

"Nondelegable duties generally are imposed, most often by statute, contract or common law, in recognition of the policy judgment that certain obligations are of such importance that employers should not be able to escape liability merely by hiring others to perform them. . . . In such circumstances, the nondelegable duty doctrine means that [the employer] may contract out the performance of [its] nondelegable duty, but may not contract out [its] ultimate legal responsibility." (Citation omitted; internal quotation marks omitted.) *Machado* v. *Hartford*, supra, 292 Conn. 371–72.

With regard to nondelegable duties arising out of a lessor's contractual obligation to make repairs, § 419 of the Restatement (Second) of Torts provides: "A lessor of land who employs an independent contractor to perform a duty which the lessor owes to his lessee to maintain the leased land in reasonably safe condition, is subject to liability to the lessee, and to third persons upon the land with the consent of the lessee, for physical harm caused by the contractor's failure to exercise reasonable care to make the land reasonably safe." 2 Restatement (Second), supra, § 419. Comment (c) to § 419 states: "If the lessor is under a statutory or contractual duty to repair, he is subject to liability . . . for harm caused by the careless or unskillful workmanship

which the contractor bestows upon the repairs which he makes . . . ." Id., § 419, comment (c).

First, we note that the defendants' argument that JC Corporation did not owe a duty to the plaintiff because the work performed required that Interstate possess a permit is without merit. Independent contractors often will perform work that requires that the independent contractor possess a permit that the property owner does not have. This has no bearing on whether the property owner has an independent duty arising under contract, statute or common law. The duty of property owners to invitees to use ordinary care to maintain the premises is one such duty at common law, but it is not relevant in this case. As the defendants point out, the plaintiff was not an invitee on the property and, in fact, was not present on the property when the fire occurred. Therefore, this common-law duty to invitees to use ordinary care is not an appropriate basis for a finding of vicarious liability.

The parties' contract, however, contained such a nondelegable duty, namely, the duty of JC Corporation to make repairs to the kitchen for the benefit of the plaintiff. In accordance with § 419 of the Restatement (Second) of Torts, once JC Corporation agreed to make these repairs, namely, removing the ventilation hood and disarming the fire suppression system, JC Corporation could delegate performance of the repairs, but not the ultimate legal responsibility for any harm caused by its independent contractor. See also *Machado* v. *Hartford*, supra, 292 Conn. 371–72. Therefore, JC Corporation had a nondelegable duty to the plaintiff arising under its lease to perform repairs, and the court properly concluded that JC Corporation was vicariously liable for any harm caused by Interstate's gross negligence.

## II

## RECKLESSNESS

In addition to finding in favor of the plaintiff on its gross negligence claims, the court also found in favor of the plaintiff on its recklessness claims against all of the defendants. This court has noted that recklessness requires a showing greater than that required to prove gross negligence. E.g., *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 97 Conn. App. 541, 577, 905 A.2d 1214, cert. denied, 280 Conn. 942, 943, 912 A.2d 479 (2006). Accordingly, a finding of recklessness on the part of JC Corporation necessarily would encompass a finding of gross negligence and would make JC Corporation liable to the plaintiff for damages under clause 29 of the lease.

The defendants assert that the court improperly determined that Interstate acted recklessly and that JC Corporation was vicariously liable for this recklessness. Specifically, the defendants claim that the court improperly found that JC Corporation also was directly liable for recklessness on the basis of Julie Chen's actions. Furthermore, the defendants assert that Julie Chen cannot be held individually liable to the plaintiff because she did not owe a duty to the plaintiff in her individual capacity. Finally, the defendants claim that the court improperly determined that Julie Chen was acting as an agent of Hsiao-Wen Chen and Tea House and that both could be held liable for Julie Chen's alleged recklessness. We address each claim in turn.

### A

### Interstate

The defendants do not challenge the court's finding of Interstate's recklessness, except on an evidentiary ground. The defendants claim that the court improperly

relied on the opinion of an expert witness who characterized Interstate's conduct as a "reckless act." According to the defendants, the court properly sustained their objection to this "exact matter" as an inadmissible legal conclusion of an expert witness pursuant to § 7-3 (a) of the Connecticut Code of Evidence.[8] The defendants claim, however, that the court went on to rely on expressly this same legal conclusion in its decision. We are not persuaded.

The defendants objected to expert testimony that Interstate's actions amounted to a "disregard" of industry fire safety standards. The court sustained the objection, ruling that the expert could testify with regard to the existence of the violations of industry standards but not the extent of the violations. The expert's characterization of Interstate's conduct as a "reckless act" was in his written report, which was entered as a full exhibit at trial without objection by the defendants. If the defendants believed that the expert's report drew impermissible legal conclusions, they had the opportunity to make this objection at trial. To the extent that the defendants now attempt to make this argument for the first time on appeal, we decline to afford it review. See, e.g., *Balaska* v. *Balaska*, 130 Conn. App. 510, 519, 25 A.3d 680 (2011) ("generally this court will not review claims that were not properly preserved in the trial court" [internal quotation marks omitted]).

Having concluded that the defendants have not raised properly any claim regarding the court's finding of recklessness on the part of Interstate, we turn to the issue of JC Corporation's vicarious liability for Interstate's

---

[8] Section 7-3 (a) of the Connecticut Code of Evidence provides: "Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that, other than as provided in subsection (b), an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue."

reckless conduct. The trial court found JC Corporation vicariously liable for the recklessness of Interstate. In their brief to this court, the defendants incorporated by reference their arguments relating to the trial court's finding of vicarious liability for Interstate's gross negligence. Our analysis of this issue is identical to our analysis of JC Corporation's vicarious liability for Interstate's gross negligence. See part I B of this opinion. Accordingly, we agree with the court's determination that JC Corporation is vicariously liable for Interstate's recklessness.

## B

### JC Corporation

In addition to finding that JC Corporation was vicariously liable for Interstate's reckless conduct, the court found that JC Corporation itself, through its agent, Julie Chen, acted recklessly. We address the defendants' challenge to this finding on appeal. The defendants argue that Interstate did not warn Julie Chen that it would use a plasma cutter to cut the ductwork flush to the ceiling, or that this would risk starting a fire. According to the defendants, Julie Chen's actions in leaving the premises after smelling burnt metal and without notifying anyone about the smell did not amount to recklessness. The defendants argue that, irrespective of Julie Chen's actions, it was Interstate's responsibility to refuse to remove the ductwork if doing so would be unsafe. We disagree.

The following additional facts as found by the court are relevant. After Interstate cut the ductwork flush to the ceiling, Julie Chen noticed the smell of burnt metal within the building. She did nothing in response, leaving the building without calling Interstate or the fire department. Hours later, while on her way to New Hampshire for the weekend, she received a telephone call that there was a fire at the building.

We review the court's finding of recklessness to determine whether it is clearly erroneous. "Whether the defendant acted recklessly is a question of fact subject to the clearly erroneous standard of review." (Internal quotation marks omitted.) *Dunn* v. *Peter L. Leepson, P.C.*, 79 Conn. App. 366, 371, 830 A.2d 325, cert. denied, 266 Conn. 923, 835 A.2d 472 (2003).

"Recklessness requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man, and the actor must recognize that his conduct involves a risk substantially greater . . . than that which is necessary to make his conduct negligent. . . . More recently, we have described recklessness as a state of consciousness with reference to the consequences of one's acts. . . . It is more than negligence, more than gross negligence. . . . The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . Wanton misconduct is reckless misconduct. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action." (Citations omitted; internal quotation marks omitted.) *Matthiessen* v. *Vanech*, 266 Conn. 822, 832–33, 836 A.2d 394 (2003).

The court's finding that JC Corporation acted recklessly is not clearly erroneous. As discussed in part I B 1 of this opinion, the court found that Barnes advised Julie Chen that cutting the ductwork flush to the ceiling posed a fire risk. It does not matter whether Julie Chen knew what cutting tool, exactly, created this fire risk. The court based its finding of recklessness upon her

disregard of Barnes' warning regarding cutting the duct-work as well as her subsequent failure to take any action upon smelling burnt metal after Interstate had finished its work. We conclude that the facts, considered together, support a finding that JC Corporation acted with "reckless disregard of the just rights or safety of others or of the consequences of the action." (Internal quotation marks omitted.) Id.

The defendants' assertion that JC Corporation did not act recklessly because it was Interstate's responsi-bility to refuse to cut the ductwork flush to the ceiling is without merit. The court found that Interstate's actions amounted to recklessness, but this finding has no bear-ing on whether JC Corporation also was reckless in instructing Interstate to perform the work. That Inter-state employees, acting prudently, should have refused to perform the work requested by Julie Chen and should have called Barnes for permission to proceed before removing the ductwork merely supports the court's finding of recklessness on the part of Interstate.

## C

### Julie Chen

Next, the defendants argue that the court improperly determined that Julie Chen could be held individually liable on the plaintiff's recklessness claim. Specifically, the defendants assert that Julie Chen cannot be held liable to the plaintiff in her individual capacity because she did not owe a duty to the plaintiff. The defendants maintain that Julie Chen was not a party to the lease, no statute has been cited that imposed a duty on her and she could not have anticipated the harm that resulted from her actions. We disagree.

We afford plenary review to the defendants' claim that Julie Chen did not owe a duty to the plaintiff. "The issue of whether a duty exists is a question of law . . .

which is subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Baptiste* v. *Better Val-U Supermarket, Inc.*, 262 Conn. 135, 138, 811 A.2d 687 (2002). "A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act. . . . There is no question that a duty of care may arise out of a contract, but when the claim is brought against a defendant who is not a party to the contract, the duty must arise from something other than mere failure to perform properly under the contract." (Citation omitted; internal quotation marks omitted.) *Sturm* v. *Harb Development, LLC*, 298 Conn. 124, 139–40, 2 A.3d 859 (2010). "The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised." (Internal quotation marks omitted.) *Allen* v. *Cox*, 285 Conn. 603, 610, 942 A.2d 296 (2008).

We conclude that Julie Chen owed the plaintiff a duty to use care. The possibility of harm to the plaintiff and its leasehold interest in the event of a fire was foreseeable. Barnes warned her of the risk of fire if the ductwork was cut flush to the ceiling, and she decided to instruct Interstate to perform this work regardless of this significant risk. Given this warning, a reasonable person would anticipate that taking those actions might cause a fire. Therefore, we agree with the court that Julie Chen owed the plaintiff a duty to use reasonable care and may be held individually liable to the plaintiff for recklessness.

## D

### Hsiao-Wen Chen and Tea House

Finally, the defendants claim that, even if Julie Chen appropriately may be held individually liable for recklessness, the court improperly determined that Julie

Chen was acting as an agent for Hsiao-Wen Chen and Tea House and, accordingly, that they could be held liable to the plaintiff for recklessness. We decline to review this claim.

It is not an appropriate function of this court, when presented with an inadequate record, to speculate as to the reasoning of the trial court or to presume error from a silent record. E.g., *McCarthy* v. *Cadlerock Properties Joint Venture, L.P.,* 132 Conn. App. 110, 118, 30 A.3d 753 (2011) ("[o]ur role is not to guess at possibilities, but to review claims based on a complete factual record developed by [a] trial court" [internal quotation marks omitted]). "This court does not presume error on the part of the trial court . . . ." *State* v. *Tocco,* 120 Conn. App. 768, 781 n.5, 993 A.2d 989, cert. denied, 297 Conn. 917, 996 A.2d 279 (2010). "[T]he trial court's ruling is entitled to the reasonable presumption that it is correct . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Koslik,* 116 Conn. App. 693, 704–705, 977 A.2d 275, cert. denied, 293 Conn. 930, 980 A.2d 916 (2009).

Neither the court's decision nor its subsequent articulation sets forth the evidence or the legal standards that it relied on in determining that an agency relationship existed between Julie Chen and Hsiao-Wen Chen. Thus, we are left to speculate as to the factual and legal basis for its decision, which is an inappropriate role for this court. E.g., *McCarthy* v. *Cadlerock Properties Joint Venture, L.P.,* supra, 132 Conn. App. 118. Accordingly, we conclude that the record is inadequate for review, and we decline to review the claim.

III

PIERCING THE CORPORATE VEIL

The defendants claim that the court improperly pierced the corporate veils of JC Corporation and Tea

House. The defendants assert that the court failed to make findings of fact sufficient to support a determination of piercing the corporate veil of either corporation.

We review the court's decision to pierce the corporate veil to determine whether it was clearly erroneous. "Whether the circumstances of a particular case justify the piercing of the corporate veil presents a question of fact. . . . Accordingly, we review the trial court's decision whether to pierce [a corporation's] corporate veil under the clearly erroneous standard of review." (Citations omitted; internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 234, 990 A.2d 326 (2010).

"Courts will . . . disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor. . . . We have affirmed judgments disregarding the corporate entity and imposing individual stockholder liability when a corporation is a mere instrumentality or agent of another corporation or individual owning all or most of its stock. . . .

\* \* \*

"The concept of piercing the corporate veil is equitable in nature. . . . No hard and fast rule, however, as to the conditions under which the entity may be disregarded can be stated as they vary according to the circumstances of each case. . . . Ordinarily the corporate veil is pierced only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice. . . . The improper use of the corporate form is the key to the inquiry, as [i]t is true that courts will disregard legal fictions, including that of a separate

corporate entity, when they are used for fraudulent or illegal purposes. Unless something of the kind is proven, however, to do so is to act in opposition to the public policy of the state as expressed in legislation concerning the formation and regulation of corporations." (Citations omitted; internal quotation marks omitted.) Id., 231–34.

Our courts have concluded that the corporate veil may be pierced if either the instrumentality rule or the identity rule is satisfied. In the present case, the court expressly relied on both doctrines. "The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of. . . .

"The identity rule has been stated as follows: If [the] plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." (Internal quotation marks omitted.) Id., 232.

## A

### JC Corporation

The defendants claim that the court improperly pierced the corporate veil of JC Corporation. The defendants claim that the evidence does not support the court's determination that JC Corporation did not observe corporate formalities and was controlled as one enterprise with Tea House by Julie Chen and Hsiao-Wen Chen. According to the defendants, neither the instrumentality rule nor the identity rule supports the court's decision to pierce the corporate veil of JC Corporation. We disagree.

First, the defendants claim that the court improperly pierced the corporate veil of JC Corporation under the instrumentality rule. The defendants claim that the court's findings do not support its determination on the first prong of the instrumentality rule, which is that Julie Chen and Hsiao-Wen Chen exercised complete control over JC Corporation. Additionally, the defendants assert that the court made no findings to support its decision on the second and third prongs, namely, that the control was used to commit a fraud or other wrong and was the proximate cause of the plaintiff's injury.

The following additional facts found by the court are relevant. Julie Chen and her mother, Hsiao-Wen Chen, were the sole officers of JC Corporation. Julie Chen ran the day-to-day operations of JC Corporation, and she and Hsiao-Wen Chen had complete control of its finances. JC Corporation supposedly had four shareholders,[9] each with a 25 percent interest, but Julie Chen

---

[9] The four shareholders were Julie Chen, Hsiao-Wen Chen, James Chen and Elizabeth Chen. James Chen is one of Hsiao-Wen Chen's sons. Elizabeth Chen is the wife of Hsiao-Wen Chen's other son, Jack Chen. Jack Chen previously owned a 25 percent share of JC Corporation, but he transferred this share to Elizabeth Chen sometime before 2006.

and Hsiao-Wen Chen made all corporate decisions without consulting the other two shareholders. In particular, the other two shareholders were not contacted regarding JC Corporation's lease with the plaintiff.

Although the key money agreement referenced a "lease" between JC Corporation and Tea House, the only document produced at trial evidencing such a lease was a one page agreement, handwritten in Chinese, purportedly between Hsiao-Wen Chen and Dorothea Wu, a friend of Hsiao-Wen Chen. Hsiao-Wen Chen testified that she drafted the agreement, and she translated it into English at a deposition and also testified as to its meaning. The court determined that the document reflected only an "agreement to agree," whereby Hsiao-Wen Chen and Wu agreed that, if they ever received zoning approval for a restaurant at 1076 East Putnam Avenue and a certificate of occupancy, they would then enter into a lease to open a restaurant.

Following the fire, JC Corporation received an insurance payment in the amount of $471,384 from its insurance company, which included itemized payment for the improvements made to the premises pursuant to JC Corporation's lease with the plaintiff. Considering that the key money agreement required the plaintiff to pay Tea House, not JC Corporation, as the owner of these improvements, the court found that this insurance claim demonstrated that JC Corporation and Tea House were "so interrelated and intertwined and dominated by Julie Chen and [Hsiao-Wen] Chen that they were indistinguishable."

With respect to the first prong of the instrumentality rule, we conclude that the court's finding that Julie Chen and Hsiao-Wen Chen completely controlled JC Corporation was not clearly erroneous. The court found that Julie Chen and Hsiao-Wen Chen dominated the day-to-day operations of the corporation, had sole control of

its finances and controlled it to the complete exclusion of the other shareholders, in disregard of corporate formalities. Additionally, the court found that Julie Chen and Hsiao-Wen Chen entered into the present lease agreement with the plaintiff without any notice to the other shareholders of JC Corporation. Given these facts, the court's finding that JC Corporation had no separate mind or will of its own was not clearly erroneous.

To the extent that the defendants argue that the court failed to make findings regarding the second and third prongs of the instrumentality rule, we decline to review the claim. As discussed in part II D of this opinion, it is not an appropriate function of this court to speculate as to the trial court's reasoning or to presume error from a silent record. See, e.g., *McCarthy* v. *Cadlerock Properties Joint Venture, L.P.*, supra, 132 Conn. App. 118; *State* v. *Tocco*, supra, 120 Conn. App. 781 n.5. Although the court's articulation sets forth the instrumentality rule and properly applies factual findings to its first prong, relating to control over the corporation, the articulation does not detail how the second and third prongs are satisfied. As reviewing the court's decision on these two prongs would require us to speculate as to the court's reasoning or to presume error from a silent record, we decline to review this aspect of the defendants' claim.

Although our conclusion under the instrumentality rule is sufficient to conclude that the court properly pierced JC Corporation's corporate veil, we will consider the defendants' claim that the court improperly applied the identity rule. The defendants assert that the court based its decision solely on its factual finding that there was a common officer between JC Corporation and Tea House. We disagree. The court made a number of additional findings relevant to an inquiry under the identity rule, including that JC Corporation

accepted insurance proceeds for the destruction of improvements that supposedly were owned by Tea House. The court found that JC Corporation and Tea House were so intermingled that they were indistinguishable, that both corporations were completely dominated by Julie Chen and Hsiao-Wen Chen and that allowing Julie Chen and Hsiao-Wen Chen to avoid liability to the plaintiff because they acted through these purported corporations would be unjust. The court explicitly relied on all of these findings in its decision, and its finding that they supported piercing the corporate veil is not clearly erroneous.

## B

### Tea House

The defendants claim that the court improperly pierced the corporate veil of Tea House. They argue that it is unclear whether the court relied on either the instrumentality rule or the identity rule, but they assert that all of the findings "are covered by" the instrumentality rule.[10] We disagree.

[10] Additionally, the defendants contend that the court improperly relied on parol evidence in piercing the corporate veil of Tea House. Specifically, the defendants assert that the court improperly allowed Brune to testify regarding her understanding of the key money agreement, which was that the key money payment was made in consideration of improvements made to the property by Tea House, rather than the right to enter into the lease. According to the defendants, this testimony was improper parol evidence, and this court should not review any findings that were made on the basis of this evidence. This argument is without merit.

"Because the parol evidence rule is not an exclusionary rule of evidence . . . but a rule of substantive contract law . . . the [defendants'] claim involves a question of law to which we afford plenary review." (Internal quotation marks omitted.) *Conn Acoustics, Inc.* v. *Xhema Construction, Inc.*, 88 Conn. App. 741, 745, 870 A.2d 1178 (2005). The court found that the key money agreement, read as a whole, was ambiguous. Therefore, the court allowed parol evidence, including Brune's testimony, to clarify the agreement's meaning. We agree with the court that the key money agreement, read as a whole, does not reflect clearly whether the parties intended the key money payment to be made in consideration of the improvements to the building or for the right to enter into the lease. The court properly considered parol evidence to ascertain the intent of the parties in entering

The court's articulation very clearly states that, in reaching its decision to pierce the corporate veil of Tea House, the court applied both the instrumentality rule and the identity rule. The defendants' suggestion that the court's findings "are covered by" the instrumentality rule alone finds no support whatsoever in the articulation. To the extent that the defendants do not dispute the court's finding that the corporate veil of Tea House properly could be pierced under the identity rule, there is an unchallenged ground that supports the court's decision. "[W]here alternative grounds found by the reviewing court and unchallenged on appeal would support the trial court's judgment, independent of some challenged ground, the challenged ground that forms the basis of the appeal is moot because the court on appeal could grant no practical relief to the complainant." (Internal quotation marks omitted.) *Horenian* v. *Washington*, 128 Conn. App. 91, 99, 15 A.3d 1194 (2011). Accordingly, the defendants' claims under the instrumentality rule are moot. The court's determination under the identity rule is sufficient to pierce the corporate veil of Tea House and to hold Julie Chen and Hsiao-Wen Chen individually liable to the plaintiff, and we can grant no practical relief to the defendants on their claims under the instrumentality rule.

## IV

## PREJUDGMENT INTEREST

The defendants claim that the court improperly awarded the plaintiff prejudgment interest pursuant to § 37-3a.[11] They argue that JC Corporation had a good

into the agreement. Therefore, the court's findings that relied on this evidence were not made in violation of the parol evidence rule.

[11] General Statutes § 37-3a (a) provides in relevant part: "Except as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable. . . ."

faith belief that its actions did not constitute gross negligence or wilful misconduct under the lease. In light of this belief, the defendants assert that the court erroneously determined that, following the fire and a letter from the plaintiff seeking the return of both the key money payment and a portion of the security deposit, it was wrongful for JC Corporation to retain these moneys. We disagree.

The following additional facts are relevant. Clause 25 (c) of the parties' lease provides: "If, after fire or other loss, [JC Corporation] has not substantially completed, as evidenced by the issuance of a certificate of occupancy, the restoration or rebuilding of the premises to substantially the same condition as existed prior to such fire or other casualty within 120 days after the damage or destruction then [the plaintiff] shall have the option, which must be exercised if at all not later than ten (10) days following the expiration of said 120 day period, to terminate this Lease promptly upon giving written notice thereof to [JC Corporation]."

The fire destroyed the building on October 6, 2006. As it was undisputed that JC Corporation would not complete restoration of the premises before the lapse of the 120 day period following the fire, on December 12, 2006, the plaintiff sent JC Corporation a valid notice of termination of the lease. The letter requested the return of both the key money payment and the security deposit. On December 27, 2006, the defendants responded that they were not returning the key money payment and also that they were keeping one half of the security deposit, supposedly for costs associated with landscaping that the parties had agreed to split equally.

The court determined that JC Corporation wrongfully detained this money and awarded the plaintiff prejudgment interest from January 12, 2007. The court determined that thirty days from the date of the plaintiff's

letter was a reasonable period of time to allow JC Corporation to respond.

Under § 37-3a (a), "interest may be recovered in a civil action as damages for the detention of money after it becomes payable. We have construed the statute to make the allowance of interest depend upon whether the detention of the money is or is not wrongful under the circumstances. . . . The allowance of interest as an element of damages is, thus, primarily an equitable determination and a matter lying within the discretion of the trial court. . . . We have seldom found an abuse of discretion in the determination by a trial court of whether a detention of money was wrongful. . . .

"The determination of whether or not interest is to be recognized as a proper element of damage[s], is one to be made in view of the demands of justice rather than through the application of any arbitrary rule. . . . The real question in each case is whether the detention of the money is or is not wrongful under the circumstances." (Citation omitted; internal quotation marks omitted.) *McCullough* v. *Waterside Associates*, 102 Conn. App. 23, 33, 925 A.2d 352, cert. denied, 284 Conn. 905, 931 A.2d 264 (2007).

We conclude that the court did not abuse its discretion in awarding the plaintiff prejudgment interest. The court found that it was wrongful and unjust for JC Corporation to detain the key money payment and the security deposit. Given the facts before the court, as well as its other findings of fact regarding JC Corporation's gross negligence and recklessness, such a finding was well within the discretion of the court.

The appeal is dismissed as moot only as to the claim that the trial court erred in piercing the corporate veil of Tea House on the Riverside, Inc. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.