******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

COMMERCE PARK ASSOCIATES, LLC
*v.* KIM ROBBINS
(AC 41398)

ROBBINS EYE CENTER, P.C. *v.* COMMERCE
PARK ASSOCIATES, LLC, ET AL.
(AC 41543)

Lavine, Prescott and Eveleigh, Js.

*Syllabus*

The plaintiff landlord, C Co., brought an action for breach of a commercial lease seeking to recover rent that it allegedly was owed by the defendant former tenant, R, and R's ophthalmological and surgical practice, R Co., brought a tort action against C Co. and its property manager, M Co., seeking, inter alia, monetary damages for economic injuries that R Co. suffered as a result of C Co.'s negligence and failure to make necessary repairs to the leased premises. Prior to the commencement of those actions, in August, 2007, R had executed a commercial lease to rent the entire lower level of a building owned by C Co. for a fifteen year term, with an option to extend the lease for two additional five year terms. In December, 2009, the leased premises, which were occupied by R Co., were remodeled and transformed into an eye care center, complete with, inter alia, a surgical center with operating rooms for optical surgery and an optical shop. In September, 2013, as a result of the flooding to parts of the lower level, R Co. was forced to suspend business completely for six weeks. Afterward, by relocating its examination rooms and a downsized version of its optical shop into portions of the premises designated for administrative offices, R Co. was able partially to resume operations, albeit utilizing only approximately one half of the premises. By the end of October, 2014, R Co. had repaired the flood damage and reoccupied the remainder of the premises. Beginning in the third full week of April, 2015, and continuing into May and June, 2015, the building's sewage system backed up, causing sewer water and waste to flood into the premises. On the basis of the various problems with the premises, beginning in September, 2013, and continuing until the time R and R Co. vacated the premises in June, 2015, R, through R Co., paid only approximately one half of her monthly rental obligation under the lease. C Co.'s rent action and R Co.'s tort action were consolidated and tried to the court, which rendered judgment in part for C Co. in the rent action, from which R appealed and C Co. cross appealed to this court, and rendered judgment in part for R Co. in the tort action. Specifically, regarding the rent action, the court determined, inter alia, that R Co. had been constructively evicted from the premises and that C Co. was not owed any rent under the lease from April 23, 2015, to the end of the lease period, but that C Co. was owed additional rent for the time period between November, 2014, and April 22, 2015, when there were no grounds to abate the rent. The court concluded, regarding the tort action, that although liability for any ordinary negligence by C Co. was waived by R Co. under the terms of the lease's waiver provision, R Co. was entitled to damages on its negligence claim as a result of C Co.'s gross negligence. Subsequently, the trial court granted R Co.'s motion to reargue and for reconsideration and awarded R Co. additional damages, and denied the motion to reargue and for reconsideration filed by C Co., and C Co. appealed to this court from the judgment in the tort action. *Held*:

1. R could not prevail on her claim that the trial court improperly awarded C Co. additional rent for the period between November, 2014, through the third full week of April, 2015, on the basis of its implicit factual finding that the premises were fully tenantable during that period and, therefore, that C Co. was entitled to receive the full amount of rent due under the lease, rather than the partial payments tendered by R Co.; although R claimed that the court overlooked evidence that, during the time period at issue, R Co. was unable to use certain administrative office space for its intended purpose as office space and, thus, that R

was entitled to continue partial abatement of rent during that period, the trial court's finding that there were no grounds to support abatement under the lease after October, 2014, was supported by the factual record and was not clearly erroneous, as R testified that repairs to all the water damaged areas were completed in October, 2014, the administrative office space at issue, which, prior to November, 2014, was used by R and R Co. as patient examination space and as a temporary optical shop, did not become untenantable after it was no longer needed for those alternative purposes, and the mere fact that the administrative office space would have needed additional modifications to return it to its original use as office space did not render the space untenantable for purposes of determining whether R was entitled to an abatement of rent under the lease.

2. There was no evidence in the record supporting the trial court's calculation that R owed back rent totaling $89,484.37 between November, 2014, and the end of April, 2015, which the court determined by multiplying the number of months at issue by $15,562.50, the minimum monthly base rent set forth in the lease: the trial court failed to credit partial rent payments that R Co. had made to C Co. during that time period, the court's use of the minimum monthly base rent at the time the lease was executed in 2007 failed to take into account that, pursuant to the express provisions in the lease, the basic rent was to be adjusted annually using the consumer price index and a proportional share of property taxes was to be included as an additional component of the total monthly rental obligation under the lease, and the court's use of the $15,562.50 figure was inconsistent with and unsupported by other evidence before the court, including the stipulated facts in the parties' joint management trial report and certain information in a tenant's ledger, regarding the actual amount of R's unpaid rental obligation to C Co.; accordingly, a new hearing in damages was appropriate.

3. C Co. could not prevail on its claim on cross appeal that the trial court improperly found that R was constructively evicted from the premises as a result of the serious and frequent sewer backups following the third full week of April, 2015, and that this erroneous finding thwarted C Co.'s efforts to recover the remainder of rent due under the lease, which was based on C Co.'s claim that R had been intending to vacate the premises even before the sewage backups occurred and, thus, did not vacate the premises in June, 2015, because of the sewage problems: that court was entitled to credit R's testimony at trial as satisfying the requirement that she vacated the premises because of the sewage backups that began at the end of April, 2015, and the record supported the trial court's finding that R did not vacate the premises before C Co. had notice and a reasonable opportunity to correct the problems with the building's sewer system, as C Co. and M Co. had actual notice of the sewer system defects from at least June, 2014, when a former M Co. employee informed M Co. of the sewer contractor's findings that there were sags in the sewer lines and that the floors would need to be ripped up to make needed repairs, and although C Co. did engage professionals to respond to the sewage backups at the time they occurred to address the immediate situation, there was nothing in the record to indicate that C Co. made any real effort to remedy the root cause of those backups, the origins of which were known before the first serious sewage backup ever occurred; accordingly, the trial court's finding that C Co. was afforded adequate time to remedy the defect that caused the constructive eviction was not clearly erroneous.

4. C Co. could not prevail on its claim that the trial court improperly awarded compensatory damages to R Co. on a theory of gross negligence because Connecticut common law does not recognize degrees of negligence or a cause of action sounding in gross negligence: even though Connecticut courts have not recognized a cause of action sounding in gross negligence, it does not necessarily follow that a court, in the course of adjudicating a negligence cause of action, is barred from recognizing a distinction between negligent and grossly negligent conduct, and because, in the present case, it was necessary to make such a distinction in order to determine the applicability of a contractual provision that waived a landlord's liability for ordinary negligence but not for gross negligence, the court was permitted to award damages on the basis of acts or omissions that it determined fell within a full range of negligent behavior, including, but not limited to, acts of gross negligence; moreover, C Co.'s claim that it was improper for the trial court to have

awarded damages on the basis of gross negligence because it was never pleaded by R Co. was unavailing, as R Co. recovered under a negligence theory that was pleaded, the court considered whether C Co. was grossly negligent only in order to determine whether R Co. was precluded from recovering under a negligence theory because of the indemnification clause in the lease, and this court was not persuaded that the complaint was silent with respect to allegations of gross negligence, as even though R Co., in its negligence count against C Co., never used the words "gross negligence," it nevertheless incorporated detailed factual allegations describing the conduct of C Co. and M Co. in response to the sewer backups.

5. C Co. could not prevail on its claim that the trial court improperly determined the amount of damages awarded to R Co. by incorrectly determining that the proper measure of R Co.'s damages was its loss of the beneficial use of the substantial improvements it had made to the premises prior to the constructive eviction and that the court should have, instead, limited its award of damages to the loss of the fair market value of the lease; R Co. was entitled to recover damages from C Co. based on, inter alia, the fair market value of the lease on the date that R Co. terminated the lease and the loss sustained by R Co. due to reasonable expenditures made by it before C Co.'s default, as may be appropriate, so long as no double recovery was involved, and, thus, the trial court, which had discretion to choose the appropriate measure of damages in crafting a compensatory damages award, properly considered R Co.'s loss of use of improvements as a component of the damages awarded to R Co.

6. The trial court miscalculated the amount of damages awarded to R Co. for the loss of the beneficial use of the substantial improvements R Co. had made to the premises; that court improperly included two unexercised five year option periods in calculating the expected length of the tenancy because doing so was legally inconsistent with the express terms of the lease, as the right to exercise the options was expressly conditioned on R's compliance with each and every obligation of the lease and not being in default of any provision of the lease, and the court's finding that R breached the lease by failing to pay the full rental for five and three-quarter months would have precluded her from exercising her option to extend the lease as a matter of law.

Argued March 12—officially released October 22, 2019

*Procedural History*

Action, in the first case, to recover damages for breach of a commercial lease agreement, and for other relief, brought to the Superior Court in the judicial district of Fairfield, Housing Session at Bridgeport, and action, in the second case, to recover damages for, inter alia, the defendants' alleged negligence, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the actions were consolidated and tried to the court, *Krumeich, J.*; judgment in part for the plaintiff in the first case and judgment in part for the plaintiff in the second case, from which the defendant in the first case appealed and the plaintiff in the first case cross appealed to this court; thereafter, the court, *Krumeich, J.*, granted the motion to reargue and for reconsideration filed by the plaintiff in the second case and denied the motion to reargue and for reconsideration filed by the defendants in the second case, and the defendants in the second case appealed to this court. *In AC 41398, reversed in part; further proceedings. In AC 41543, reversed in part; judgment directed.*

*James M. Moriarty*, with whom, on the brief, was *Aaron A. Romney*, for the appellant-cross appellee in

AC 41398 (defendant in the first case).

*Colin B. Connor*, with whom were *Joseph DaSilva, Jr.*, and *Robert D. Russo III*, for the appellee-cross appellant in AC 41398 (plaintiff in the first case).

*Joseph DaSilva, Jr.*, with whom were *Colin B. Connor* and, on the brief, *Robert D. Russo III* and *Marc J. Grenier*, for the appellants in AC 41543 (defendants in the second case).

*James M. Moriarty*, with whom, on the brief, was *Aaron A. Romney*, for the appellee in AC 41543 (plaintiff in the second case).

*Opinion*

PRESCOTT, J. The present appeals and cross appeal arise from two actions involving a commercial lease that share a nucleus of operative facts and were consolidated for trial. They raise, among other issues, whether the landlord's failure to take actions to remedy recurrent sewage backups into the leased premises occupied by an eye surgery center resulted in a constructive eviction that excused the tenant from the obligation to pay rent in accordance with the terms of the lease, and whether, as a result of the alleged inaction of the landlord and its property management company, the eye surgery center was entitled to recover compensatory damages for the loss of its use of improvements it previously had made to the premises.

In the action underlying AC 41398 (rent action), Commerce Park Associates, LLC (Commerce Park),[1] sought to recover rent it alleges it was owed by a former tenant, Kim Robbins—an ophthalmologist and the owner of Robbins Eye Center, P.C. (REC). REC had occupied the lower level of a commercial property owned by Commerce Park in Bridgeport pursuant to a commercial lease but vacated the premises prior to the lease's expiration following a series of sewage backups that flooded the premises. Robbins now appeals, and Commerce Park cross appeals, from the judgment of the trial court rendered in part in favor of Commerce Park. Robbins claims that the court improperly (1) awarded Commerce Park rent for a period of time from November, 2014, through the third full week of April, 2015, and (2) miscalculated the amount of the rent that she owed for that period. Commerce Park claims by way of cross appeal that the court improperly determined that Robbins was constructively evicted from the premises after the third full week of April, 2015, by the sewage backups, and, consequently, Commerce Park was not entitled to recover any rent from Robbins after that date. We affirm the judgment of the court with the exception of its calculation of the amount of the rent awarded to Commerce Park and, accordingly, remand for a new hearing in damages in the rent action.

In the action underlying AC 41543 (tort action), REC sued Commerce Park and its property manager, RDR Management, LLC (RDR), seeking monetary damages for economic injuries that REC suffered as a result of their failure to make necessary repairs to the premises. Commerce Park now appeals[2] from the judgment of the trial court rendered in part in favor of REC and awarding REC damages of $958,041.92 against Commerce Park.[3] Commerce Park claims that the trial court improperly (1) awarded damages on the basis of gross negligence because (a) Connecticut common law does not recognize distinctions or degrees of negligence and (b) REC never pleaded or otherwise asserted allegations of gross negligence prior to trial; and (2) miscalculated the

amount of damages awarded because the court (a) utilized an incorrect measure of damages in determining REC's losses and (b) misconstrued the length of Robbins' expected tenancy under the lease, which was an integral component of the court's calculation of damages. We agree that the court improperly included two unexercised lease extension options in determining the length of Robbins' tenancy and, accordingly, reverse the amount of damages awarded; we otherwise affirm the judgment of the court in the tort action.

The following facts, which either were stipulated by the parties[4] or found by the trial court, and procedural history are relevant to our discussion of the parties' claims. Beginning in 1995, Robbins leased from Commerce Park increasing amounts of space in the lower level of a commercial building it owned at 4695 Main Street in Bridgeport (building). The building, which was constructed in 1964, primarily houses medical offices and is part of a complex of office buildings owned by Commerce Park. By 2014, the building's roof, foundation, and sanitary sewer system were in poor condition and in need of repair.

Although Robbins executed the original and all subsequent leases, the leased space was occupied by REC, Robbins' ophthalmological and surgical practice. REC is a domestic professional corporation with Robbins as its sole shareholder. REC paid all rents and other charges due under the operative lease and carried all required insurance policies, which, as described by the court, made REC "the de facto tenant of the leased space with whom the landlord dealt."

On August 1, 2007, Robbins executed the lease at issue in the present appeals and cross appeal. Pursuant to the lease, Robbins agreed to rent the entire lower level of the building (premises), which consisted of 20,750 square feet of space. The lease was for a fifteen year term, with the tenant, Robbins, having the option of extending the lease for two additional five year terms. The lease required Robbins to pay rent at an adjustable rate, starting at $186,750 per year and payable in monthly installments of $15,562.50.[5] Robbins also was responsible for paying a pro rata share of the building's property taxes as additional rent.

Paragraph 23 (c) of the lease provided in relevant part: "In the event the Demised Premises shall be damaged by fire or other casualty and shall be rendered wholly or partially untenantable, then . . . Landlord shall, at Landlord's own cost and expense, proceed with all reasonable dispatch to cause the damage to be repaired and in the case of partial damage, the monthly rental for any period of such repair which is not otherwise covered by Tenant's business interruption insurance shall be abated in proportion to the portion of the Demised Premises rendered untenantable . . . ."

Paragraph 16 (b) of the lease provided in relevant part: "[*U*]*nless caused by the gross negligence or willfulness of Landlord, or of Landlord's agents*, Landlord shall not be responsible or liable to Tenant, or any person, firm or corporation claiming by, through, or under Tenant for, or by reason of, any defect in the Demised Premises . . . or from any injury or loss or damage to person or property of Tenant, for loss of or damage to property contained in or upon the Demised Premises . . . caused by or arising or resulting from pipes . . . or by or from any defect in or leakage, running or overflow of water or sewerage in any part of the Demised Premises . . . ." (Emphasis added.)

After signing the new lease, Robbins hired a contractor to transform the premises into what the trial court found was a "state-of-the-art eye care center, complete with a surgical center with two operating rooms certified by the state for optical surgery . . . a LASIK facility, and an optical shop." The remodeling was completed in December, 2009, at a cost of $1,186,267.[6]

In September, 2013, during a period of heavy rain, a downspout detached from a roof drain, which allowed water to flood into the building and inundate parts of the lower level.[7] The flooding from above was exacerbated by groundwater that seeped in through the building's porous foundation. The water caused substantial damage to REC's equipment, materials, and work spaces. As a result of the flooding, REC was forced to suspend business completely for six weeks. Afterward, by relocating its examination rooms and a downsized version of its optical shop into portions of the premises designated for administrative offices, REC was able partially to resume operations, albeit utilizing only approximately one half of the leased premises.

For months, mold would appear at various times and locations within the premises. By the end of October, 2014, however, REC had repaired the flood damage, remediated the mold infestations, and reoccupied the remainder of the premises, including the surgical center.[8]

At other times, both before and after the major flooding incident in 2013, REC's normal operations were interrupted due to contaminated water that leaked into the premises from blocked toilets in the offices or common areas of the upper floors of the building. Patients and staff often smelled urine or other foul odors at various locations throughout the lower floor. The court found that these various smaller leaks, although certainly disruptive, never rendered the premises untenantable. Nevertheless, as the court noted, "Robbins and REC became disenchanted with RDR's and [Commerce Park's] attitude and efforts to maintain and repair the building. The periodic plumbing problems, unpleasant odors and mold blooms proved to be quite disruptive

[to] the practice and eroded any goodwill remaining between Robbins and REC, on one side, and RDR and [Commerce Park], on the other." On the basis of the various problems with the premises, beginning in September, 2013, and continuing until the time REC vacated the premises on June 30, 2015, Robbins, through REC, paid only approximately one half of her monthly rental obligation under the lease.

Beginning in April, 2015, and continuing into May and June, 2015, the building's sewage system backed up, causing sewer water and waste to flood the premises. Specifically, sewage flooded the premises on April 23, 27, and 28, 2015. In addition, on April 29, 2015, a plumber hired by RDR accidently cut a waste pipe, causing additional sewer water and fecal matter to contaminate REC's offices. Continued incidents of sewage backups in the following months culminated in a major event on June 29, 2015. At that time, REC complained to municipal authorities, including Lawrence Palaia, the sanitarian of the city of Bridgeport. Palaia, who described the premises as having "sewer water all over the place," issued a notice of violation to Commerce Park and RDR, and ordered REC to close operations until the problem was remedied. As set forth in the court's memorandum of decision, "[t]he notice demanded that [Commerce Park] engage a contractor acceptable to the city [of Bridgeport], take out any necessary permits, and commence repairs within three business days. The [premises were] supposed to be vacant until the city signed off on [their] condition after repairs and cleanup." REC and Robbins vacated the premises on June 30, 2015.

The serious and persistent problems with the building's sanitary sewer system were known by Commerce Park and RDR and were well-documented. The court made the following findings regarding the problems that existed and the response by Commerce Park and RDR: "[T]here were several serious backups of the sewer system . . . into the [premises] as a result of known defects in the sewer system that RDR and [Commerce Park] failed to address effectively. No one has a map of the sewer system, which has a main sewer line under the slab and branch lines connected to an uncounted number of plumbing fixtures throughout the [b]uilding. The main sewer line is a gravity fed system that uses four inch cast-iron pipes to pass sewer water, paper and effluent into a cistern, where it is collected and, when it reaches a certain level, is ejected out of the [b]uilding by two ejector pumps. One problem with the system is that there is insufficient pitch in the main line to efficiently pass water and material to the cistern. . . . [T]here was insufficient space for the existing main line to be building code compliant in pitch of the pipes into the cistern. The other related problem is that the system lacked uniformity of pitch. The cast-iron pipe used in the system has multiple sags, some of

which were major and acted as pockets that trapped water and material flushed down the toilets that, together with insufficient pitch, ultimately led to clogs, which backed up the system and sent sewer water, effluent and raw sewage into the lower level occupied by REC on a number of occasions." (Internal quotation marks omitted.)

As further explained by the court, on at least five occasions between 1997 and 2015, sewer contractors hired by RDR made videotapes of the sewer system in conjunction with clearing out blockages in the system. "These videos demonstrated a deteriorating sewer piping system as penetration of the pipe and sags worsened over time. The first video in 1997 showed a penetration of a rock into the main line, and subsequent videos in 2014 and 2015 showed multiple sags worsening over time. . . . [T]here were sags throughout the main line and laterals, some of which were major and severe enough to cause backups. . . . [T]here were clogs all over the system, not just in one place . . . . [F]loods to the lower floor would be caused by a clog in the main line, not the laterals. . . . [T]he recurrence of problems more frequently indicated [that] there was a problem with the performance of the system, and [RDR's sewer contractor] had discussed the defects and possible remedies with RDR, such as cutting up the floor to replace the pipes, as well as controlling what went into the system. A former employee of RDR . . . was present when a video was taken on June 12, 2014, and informed RDR of the sewer contractor's concern about sags that needed to be fixed, and also about the need to rip up the floors to make repairs to the pipes. He was also present when the video was taken on June 28, 2015, when multiple sags were seen, and he told RDR . . . that the sewer contractor expressed concern about sags, in particular, a major sag in the main line, approximately twenty feet from the ejector pit, that needed to be dug up and fixed. . . . [T]he major sags, along with lack of pitch, had become worse over time and interfered with the performance of the system and caused the sewage backups into the [premises]." (Footnotes omitted; internal quotation marks omitted.)

Moreover, as expressly found by the court, both RDR's sewer contractor and RDR's own personnel had advised RDR about the presence of the sags in the system, that those sags were the cause of the many sewer backups in the building, and that the sags could be remedied properly only by tearing up the floor and replacing the affected sections of the pipe. RDR also was informed by its contractor that, if it chose not to repair the sags, "it would be necessary to carry on a preventative maintenance program to periodically snake the sewer system to break up potential clogs before they were formed. RDR and [Commerce Park] pursued neither course but merely decided to address system backups as they occurred."[9]

Commerce Park commenced the action against Robbins for back rent on June 24, 2014, which was after the flooding event of September, 2013, but prior to the major sewage backups in 2015. The one count complaint alleged that Robbins had breached her obligations under the lease because, after August, 2013, she had failed to make the full required monthly rental payments.

Robbins filed an answer, special defenses, and counterclaims on August 14, 2014. By way of special defense, Robbins asserted that Commerce Park breached the lease by failing to maintain the premises in a tenantable condition, thus excusing her own nonperformance. Robbins further claimed that she was entitled to a setoff from any rent owed for the damages she sustained as a consequence of Commerce Park's "gross negligence and wilfulness in maintaining the leased premises," and that she was entitled to an abatement of the rent under the provisions of the lease due to damage from the water and sewer infiltrations that rendered the premises untenantable. Robbins also alleged counterclaims sounding in breach of contract, tort, constructive eviction, and a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.

Robbins later determined that the damages she sought by way of relief in her counterclaims in the rent action actually were incurred by REC. Consequently, on September 9, 2016, REC commenced the underlying tort action against Commerce Park and RDR. Count one of the operative complaint in the tort action alleged negligence against Commerce Park for breach of its duty to properly maintain the premises. Count two alleged negligence against RDR for breaching its property management responsibilities by utilizing unlicensed plumbers to conduct repairs, knowing that failure to repair and replace the sewage line properly could cause substantial damage to REC. Count three alleged common-law recklessness by Commerce Park. Counts four and five alleged violations of CUTPA against Commerce Park and RDR, respectively.

On October 7, 2016, Robbins filed a motion seeking to consolidate the two matters, which the court granted. Robbins thereafter withdrew her counterclaims in the rent action. The matters were consolidated and tried to the court, *Krumeich, J.*, over seven days in July, 2017. The parties each submitted multiple posttrial briefs.

The court issued a memorandum of decision resolving the two actions on February 6, 2018. The court first addressed Commerce Park's allegations in the rent action that Robbins had breached the lease and that it was owed additional rent for the period of time that REC occupied the premises but had failed to pay its full monthly rental obligations, as well as for the time

period after REC vacated the premises through the termination date of the lease. The court agreed with Robbins that REC had been constructively evicted from the premises as a result of the numerous sewer backups beginning in the last week of April, 2015, and continuing until REC vacated the premises at the end of June, 2015. Accordingly, the court determined that Commerce Park was not owed any rent under the lease from April 23, 2015, through the end of the lease period.[10]

The court determined, however, that Commerce Park was owed additional rent for a portion of the period beginning in September, 2013, and continuing through the first three weeks of April, 2015, during which time REC had paid only one half of the total rent due under the lease. According to the court, "[w]ith respect to the period [of] September, 2013, to October, 2014, there should be a partial rent abatement that, based roughly on the area affected, justifies the reduced rent paid by REC. There were five and three-quarter months, however, [between November, 2014, and April 22, 2015], when there [were] no grounds to abate the rent. Failure to pay the full rental for those months was a breach of the lease, and [Commerce Park] was damaged to the extent [that] rents for those months were reduced unilaterally by the tenant in the amount of $89,484.37 ($15,562.50 per month for [six] months minus $3,890.63 for the last week of April, 2015)."[11]

The court next turned to REC's claim for damages in the tort action against Commerce Park and RDR premised on allegations of negligence, recklessness, and violation of CUTPA. The court explained that Commerce Park "relies on the negligence waiver in [paragraph 16 (b) of] the lease as a defense, which it argues also extends to its agent, RDR."

The court first determined that, although the indemnification clause of the lease prevented Robbins and REC from recovering on the basis of any ordinary acts of negligence on the part of Commerce Park relating to the sewage backups or seepage of water caused by the porous foundation, such exculpation, by the plain terms of the clause, did not extend to RDR as Commerce Park's agent. Nevertheless, the court found that RDR could not have repaired the sewer problems without authorization from Commerce Park because the problems went beyond simple maintenance issues and would have required major capital expenditures by Commerce Park. For that reason and others, the court concluded that any failure by RDR to repair the sewer system was, under the circumstances, neither negligent, reckless or a violation of CUTPA.

With respect to Commerce Park, the court first determined that its liability for any ordinary negligence clearly was waived by REC under the terms of the lease's waiver provision. The court noted, however, that the waiver clause expressly excluded any waiver of

liability for conduct that amounted to "gross negligence" or, by logical extension, recklessness. See *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 382, 119 A.3d 462 (2015) (recklessness involves conduct that "is more than negligence, more than gross negligence" [internal quotation marks omitted]). The court relied on our Supreme Court's definition of gross negligence as "very great or excessive negligence, or as the want of, or failure to exercise, even slight or scant care or slight diligence . . . ." (Internal quotation marks omitted.) *19 Perry Street, LLC* v. *Unionville Water Co.*, 294 Conn. 611, 631 n.11, 987 A.2d 1009 (2010).

With respect to whether Commerce Park's actions or inaction in the present case amounted to gross negligence, the court reasoned as follows: "The failure to repair the sewer system or to carry out a preventative maintenance program breached [Commerce Park's] duties under the lease and was more than 'mere neglect' but, [rather], a conscious choice to risk future floods and expose REC to repeated disruption of its business. . . . It was foreseeable that [Commerce Park's] decision not to make the repairs to the sewer system recommended by the sewer contractor in violation of its repair obligations under the lease (paragraphs 16, 18, 23) and common-law duty, or its failure to carry out a preventative maintenance program outlined by the contractor as an alternative, would result in future sewage overflows in the basement space occupied by REC. It was also foreseeable that periodic sewage floods into the [premises] would seriously disrupt Robbins' and REC's ability to conduct a medical practice in the offices and to use the operating rooms, rendering the [premises] untenantable. [Commerce Park's] conduct was grossly negligent." (Citation omitted.)

Although the court concluded that REC was entitled to damages as a result of Commerce Park's gross negligence, it ruled in favor of Commerce Park with respect to the additional counts alleging recklessness and a violation of CUTPA. The court, citing to our Supreme Court's definition of recklessness in *Matthiessen* v. *Vanech*, 266 Conn. 822, 832–33, 836 A.2d 394 (2003), found that, although Commerce Park's decision not to heed expert advice regarding the defects in the sewer system was grossly negligent, its actions "did not sink to the level of highly unreasonable conduct, involving an extreme departure from ordinary care" and, thus, "did not constitute reckless conduct."[12] (Internal quotation marks omitted.) The court also rejected the CUTPA count against Commerce Park, finding that the evidence presented failed to demonstrate unfair or deceptive conduct that would violate the "cigarette rule."[13] (Internal quotation marks omitted.)

The court recognized that quantifying the amount of damages to award REC for Commerce Park's gross negligence was a challenge. The court first acknowl-

edged that there was insufficient evidence presented to award REC damages on the basis of lost profits resulting from the interruption of its business. The court, however, concluded that if a tenant has made improvements to a leased premises and is subsequently forced by the landlord's misconduct to abandon the premises, the tenant is entitled to recover damages on the basis of its loss of the beneficial use of the improvements the tenant would have enjoyed during the remaining term of the lease. Such damages, according to the court, are measured by determining the period of time the tenant had use of the improvements compared against the period of time the tenant would have had the right to use them under the terms of the lease. The court found that REC had used the improvements it made to the premises for "five years and four months out of a twenty-two year term (ten years after the completion of the improvements plus two five year options). Therefore, REC's damages are 75.8 percent of the improvement cost, which totals $899,190 ($1,186,267 x 75.8 percent)."

REC filed a motion for an award of postjudgment interest, and both REC and Commerce Park filed motions seeking reconsideration and reargument of the damages awarded to REC. Commerce Park argued that any damages attributable to lost use of improvements should have been calculated from the lease's commencement date, not from the date that the improvements were completed. It also argued that the court failed to credit against the damages awarded $300,000 that Commerce Park allegedly contributed toward the cost of the improvements. According to REC, it was entitled to additional damages for expenses that it incurred as a result of having to abandon the premises, including moving expenses and costs related to fitting out a new, temporary work space.

The court heard arguments on the postjudgment motions on March 5, 2018. On March 22, 2018, the court filed supplemental memoranda of decision, rejecting Commerce Park's arguments but awarding REC additional damages of $58,557.55, for a total award of $958,041.92, along with postjudgment interest at a rate of 8 percent per annum.[14] These appeals and cross appeal followed.

I
AC 41398

We begin our discussion with the claims arising out of Commerce Park's action to recover unpaid rent that it asserted Robbins owed under the lease. Robbins claims on appeal that (1) the court improperly awarded Commerce Park additional rent for the period between November, 2014, through the third full week of April, 2015, and (2) even if she owed additional rent, the court miscalculated the amount of rent due. Commerce Park claims by way of cross appeal that the court improperly

determined that Robbins owed no rent following the third full week of April, 2015, because she was constructively evicted by the repeated sewage backups.

A

Robbins first claims that the court improperly awarded Commerce Park back rent for the time period between November, 2014, and the final week of April, 2015. Specifically, Robbins challenges the court's implicit factual finding that the premises were fully tenantable during that period and, therefore, that Commerce Park was entitled to receive the full amount of rent due under the lease rather than the one-half payments tendered by REC. Robbins argues that the court overlooked evidence that would have supported a contrary finding, namely, that during the time period at issue, REC was unable to use certain administrative office space for its intended purpose as office space and, thus, Robbins was entitled to continue partial abatement of rent during that period.

Commerce Park counters that, prior to November, 2014, Robbins and REC had been using the administrative office space at issue as patient examination space and as a temporary optical shop and that Robbins' argument that this same space became untenantable after it was no longer needed for these alternative purposes advances an "unreasonable and myopic view of what 'use for its intended purpose' means in the context of a commercial lease." Commerce Park argues that the mere fact that the administrative office space would have needed additional modifications to return it to its original use as office space did not render the space untenantable for purposes of determining whether Robbins was entitled to an abatement of rent under the lease.

Although Robbins' position cannot be described as wholly lacking merit, we find Commerce Park's arguments more persuasive under the terms of the lease. We conclude that Robbins has failed to demonstrate that the court's finding that there was no justification for abatement of rent during the period at issue was clearly erroneous and, therefore, that finding must stand.

As previously set forth, paragraph 23 (c) of the operative lease provided in relevant part that if the premises became "wholly or partially untenantable," rental payments "shall be abated in proportion to the portion of the [premises] rendered untenantable . . . ." The lease does not define the term "untenantable"; however, our courts previously have indicated that the question of whether premises are untenantable is one of fact for the trier, to be decided on a case-by-case basis "after a careful consideration of the situation of the parties to the lease, the character of the premises, the use to which the tenant intends to put them, and the nature

and extent by which the tenant's use of the premises is interfered with by the injury claimed." (Internal quotation marks omitted.) *Welsch* v. *Groat*, 95 Conn. App. 658, 662, 897 A.2d 710 (2006).

It is well settled that a factual finding is not clearly erroneous unless "it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . Simply put, we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) *Benedetto* v. *Wanat*, 79 Conn. App. 139, 147, 829 A.2d 901 (2003).

In its memorandum of decision, the court found that "[t]he entire [premises were] untenantable for [their] intended purpose for six weeks as a result of the September, 2013 flood" and "the area that formerly housed the clinic, optical shop and operating rooms was not tenantable until October, 2014." During that time, REC paid only one half of the rent due under the lease, and the court found, on the basis of the portion of the premises affected, that this reduction of rent was justified.

The court, nevertheless, also found that REC eventually was able to utilize the previously untenantable areas of the premises and, for the period after October, 2014, until the sewage backups began in April, 2015, "there were no grounds to abate the rent" and "[f]ailure to pay the full rental for those months was a breach of the lease . . . ." Implicit in this finding is a determination by the court that the entire premises were tenantable during that period, otherwise the court logically would have found that some continued abatement of rent was justified under the lease.

The court made no additional subordinate factual findings and provided no analysis regarding the tenantability of the premises after all areas were repaired of the damage from the September, 2013 flooding.[15] Its finding that no ground existed to support Robbins' and REC's continued abatement of rent is, nevertheless, supported by some evidence in the record. Robbins testified that repairs to all the water damaged areas were completed in October, 2014. She also testified that once the administrative office space was no longer needed as examination space, it would have needed to be remodeled to return it to its original use as office space. Robbins never testified or presented any other evidence, however, that would have mandated a finding by the court that the former administrative space was ever "untenantable," meaning unusable for a purpose related to REC's operations.[16] Robbins testified that, at the time, she had been considering converting some of the office space into additional operating rooms, which

demonstrates that the space had a variety of potential uses for REC and Robbins aside from its use as administrative offices.

Even assuming that REC would have had to expend additional resources to return the office space to its original use, that fact alone does not directly conflict with the court's finding, which was not that the space was available for use as administrative offices, but that there was no basis for abating rental payments. Under the express terms of the lease, rent abatement was permitted for periods in which all or part of the premises were rendered untenantable due to damage caused by fire or other casualty, and then only during the period of repair. Here, even if the converted administrative office space could not be used for its originally intended purpose, the record indicates that this portion of the premises was not significantly damaged and rendered untenantable as a result of the September, 2013 flood or any other casualty during the period at issue and was not undergoing repair. Accordingly, the court's finding that there were no grounds to support abatement under the lease after October, 2014, is supported by the factual record before the court.

Moreover, although Robbins suggests that the evidence before the court could have supported a different conclusion, it is not the function of this court to retry the facts or pass on the credibility of fact witnesses. See *Johnson* v. *Fuller*, 190 Conn. 552, 556, 461 A.2d 988 (1983) (affirming court's finding that premises were tenantable despite uncontroverted expert testimony to contrary). Because there is evidence in the record to support the court's factual findings, and we are not left with a firm and definite conviction that a mistake was made, we do not agree that the court's finding that rent abatement was unjustified for the period in question was clearly erroneous.

B

Robbins next claims that, even if she owed Commerce Park some additional rent for the five and three-quarter months between November, 2014, and the end of April, 2015, there is no evidence in the record supporting the court's calculation that she owed back rent totaling $89,484.37. In particular, Robbins argues that the court failed to credit partial rent payments that REC made to Commerce Park during that time period. Commerce Park responds that the language used by the court suggests that it took into account any partial payments made, but principally argues that the court's damages award is unreviewable because the court did not set forth the precise basis for its calculations in its memorandum of decision and Robbins failed to seek an articulation from the court. We agree with Robbins that the court's unpaid rent calculation is unsupported by the record.

The following facts are relevant to this claim. The court concluded that Robbins breached the lease by not making full rental payments for the five and three-quarter months at issue. The court determined that the proper measure of damages to award Commerce Park was the amount of any unpaid rent, which the court determined was $89,484.37. In arriving at that number, the court, in essence, multiplied the number of months at issue, or 5.75,[17] by $15,562.50, which was the minimum monthly base rent set forth in the lease. For the following reasons, however, we are left with a firm and definite conviction that the court's calculation is mistaken and, thus, must be reversed.

First, the court fully recognized that REC had not paid Commerce Park "the *full* rental" but had "*reduced* unilaterally" the amount it paid each month. (Emphasis added.) It is reasonable to infer from this language that the court was aware that, although REC had not paid its rental obligation *in full* each month, it did pay some *reduced* amount of rent during the period at issue. That inference is consistent with the court's finding earlier in the decision that REC had made reduced rent payments of approximately one half of the amount due under the lease. The court, nevertheless, appears to have based its calculation of the rent owed for the period at issue by using a figure that represented the full amount of the minimum monthly base rent due at the time the lease was executed in 2007. The court never stated that its calculation took into account any credit for the rent that REC actually had paid. REC was entitled to that credit.

Second, although $15,562.50 represented the amount of the monthly basic rent due at the time the lease was executed in 2007, the lease also expressly provided that the basic rent was to be adjusted annually using the consumer price index, as set forth in detail in exhibit B of the lease. Given that the rental period in question spanned from late 2014 into 2015, we have no confidence that $15,562.50 accurately represents the actual amount of the monthly rent owed by Robbins during the period in question or the balance due, taking into consideration partial payments. The court's use of that figure also appears to ignore that a proportional share of property taxes was to be included as an additional component of the total monthly rental obligation under the lease.

Third, the court's use of the $15,562.50 figure is inconsistent with and unsupported by other evidence before the court regarding the actual amount of Robbins' unpaid rental obligation to Commerce Park. In their joint trial management report, the parties stipulated regarding the amount of rent that Robbins paid, through REC, to Commerce Park during the period of time at issue. As stipulated, not including a payment to reimburse Commerce Park for snaking a clogged drain, Rob-

bins paid $73,424.10. As previously discussed, those payments are not reflected in the mathematical formula used by the court, and there appears to be no reasonable basis in the record for the court to have disregarded the stipulated facts. Robbins also submitted into evidence a tenant's ledger that, in addition to showing the same payments as stipulated to by the parties, lists the actual base rent for the months in question as $18,929.83 and the estimated monthly taxes as an additional $5544.87. The ledger shows that REC made monthly payments that represented one half of the total of the base rent plus taxes, or $12,237.35. Using the figures in the ledger, which were never disputed by Commerce Park, the court appears to have overstated the amount of rent owed to Commerce Park by more than $20,000.[18]

Commerce Park argues that Robbins never asked the court to articulate the factual basis for its calculation of damages and suggests that this is fatal to her claim on appeal. See *Smith* v. *Snyder*, 267 Conn. 456, 467, 839 A.2d 589 (2004) (concluding that appellants' failure to file motion for articulation to illuminate further basis for compensatory damages award left reviewing court to speculate regarding how and why court arrived at sum awarded). The record before us, however, is adequate for review. Although it is true that courts have broad discretion in calculating the amount of damages; see *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 68, 717 A.2d 724 (1998); if, as is the case here, the record clearly reflects that the figures utilized by the court were incorrect and untethered from the evidence before it, a new hearing in damages is appropriate.

C

Turning to Commerce Park's cross appeal, it claims that the court improperly found that Robbins was constructively evicted from the premises as a result of the serious and frequent sewer backups following the third full week of April, 2015, and that this erroneous finding thwarted Commerce Park's efforts to recover the remainder of rent due under the lease. It maintains that, in making this finding, the court misinterpreted and misapplied governing case law because Robbins failed to establish that (1) REC vacated the premises as a result of the sewer backups or (2) she gave Commerce Park a reasonable amount of time to correct the problem. We are not persuaded by either argument.

"[A] constructive eviction arises [if] a landlord, [although] not actually depriving the tenant of possession of any part of the premises leased, has done or suffered some act by which the premises are rendered untenantable, and has thereby caused a failure of consideration for the tenant's promise to pay rent. . . . In addition to proving that the premises are untenantable, a party pleading constructive eviction must prove that (1) the problem was caused by the landlord, (2) the

tenant vacated the premises because of the problem, and (3) the tenant did not vacate until after giving the landlord reasonable time to correct the problem. . . . Moreover, [w]hether the premises are untenantable is a question of fact for the trier, to be decided in each case after a careful consideration of the situation of the parties to the lease, the character of the premises, the use to which the tenant intends to put them, and the nature and extent by which the tenant's use of the premises is interfered with by the injury claimed. . . . That factual determination will not be disturbed by [a reviewing] court unless the conclusion is such that it could not reasonably be reached by the trier." (Citations omitted; internal quotation marks omitted.) *Welsch* v. *Groat*, supra, 95 Conn. App. 662.

In challenging the court's finding that Robbins and REC were constructively evicted from the premises as a result of the backup of the sewage into the premises beginning at the end of April, 2015, Commerce Park does not argue on appeal that the court applied an incorrect legal standard or failed to make all requisite findings. It does not contend that the sewage backup did not render the premises untenantable, nor does it argue that the backups were not "caused by the landlord." Rather, Commerce Park first argues that Robbins had been intending to vacate the premises even before the sewage backups occurred and, thus, did not vacate the premises "because of" the sewage problems. Second, it argues that she vacated the premises without giving Commerce Park a reasonable amount of time to remedy the situation.

Whether Robbins and REC vacated the premises as a result of the sewage backups and whether Commerce Park had a reasonable amount of time to remedy the sewage problems before the premises were vacated are factual determinations for the trier of fact and, thus, are subject to our clearly erroneous standard of review. See *Baretta* v. *T & T Structural, Inc.*, 42 Conn. App. 522, 527, 681 A.2d 359 (1996). It is apparent from the court's decision that it found both requirements were satisfied in this case and those findings, whether express or implied, are supported by evidence in the record.

The court expressly found that it was "the sewage backups and floods in the spring of 2015" that constructively evicted Robbins from the premises, and that Commerce Park was responsible for those backups because of its failure adequately to address and repair known defects in the buildings sewage system. Further, there can be little doubt on this record that Robbins vacated the premises "because of" the sewage backups that began at the end of April, 2015. Robbins testified at trial to the following: she made her decision to move her business to a new location after the first sewage backup; at that time, she received an estimate of $10,000

to clean and sanitize the fouled operating rooms; she quickly came to the realization that Commerce Park was not going to fix the underlying problems with the sewer pipes and that the sewage backups likely would continue, which in fact occurred; and the continued negative impact on her business and associated costs of cleanup became intolerable. The court was entitled to credit Robbins' testimony as satisfying the requirement that "the tenant vacated the premises because of the problem [caused by the landlord] . . . ." (Internal quotation marks omitted.) *Welsch* v. *Groat*, supra, 95 Conn. App. 662.[19]

Similarly, the record supports the court's finding that Robbins did not vacate the premises before Commerce Park had notice and a reasonable opportunity to correct the problems with the building's sewer system. In making this finding, the court relied on the fact that Commerce Park and RDR had actual notice of the sewer system defects from at least June, 2014. This finding is supported by the testimony of a former RDR employee that, in June, 2014, he informed RDR of the sewer contractor's findings that there were sags in the sewer lines and that the floors would need to be ripped up to make needed repairs. Moreover, as the court found, after the first sewage backup in April, 2015, Robbins learned from the sewer contractor that Commerce Park "had been advised to repair known defects in the sewer system and failed to do so . . . ." Although Commerce Park did engage professionals to respond to the sewage backups at the time they occurred to address the immediate situation, there is nothing in the record to indicate that Commerce Park made any real effort to remedy the root cause of those backups, the origins of which were known before the first serious sewage backup ever occurred. We conclude on the basis of our review of the record that the court's finding that Commerce Park was afforded adequate time to remedy the defect that caused the constructive eviction is not clearly erroneous.

In sum, our review of the record before the court shows that there was evidence to support the court's ultimate finding that there was a constructive eviction, and, thus, the finding was not clearly erroneous. Having resolved all claims raised with respect to the rent action, we turn to the appeal of Commerce Park and RDR from the decision of the court awarding REC $958,041.92 in damages in REC's tort action.

## II
### AC 41543

In AC 41543, the tort action, Commerce Park claims that (1) the court improperly awarded compensatory damages against it in favor of REC on a theory of gross negligence and (2) even if REC was entitled to damages, the court improperly determined the amount of damages. We address each of these claims in turn.

## A

Commerce Park first claims that the trial court improperly awarded damages to REC on a theory of gross negligence. According to Commerce Park, the court's decision was flawed for primarily two reasons. First, it argues that Connecticut common law does not recognize degrees of negligence or a cause of action sounding in gross negligence. Second, it argues that REC never pleaded allegations of gross negligence in its complaint and, thus, could not properly recover on that basis, even if it was a legally cognizable theory on which to impose liability. We conclude that both arguments founder on a fundamental misinterpretation of the pleadings and the legal basis for the court's decision. Accordingly, we reject this claim.

### 1

We first address the argument that it was improper for the court to have awarded damages to REC on the basis of gross negligence because Connecticut does not recognize gross negligence as separate and distinct from ordinary negligence. Although we certainly agree that Connecticut courts have not recognized a *cause of action* sounding in gross negligence, it does not necessarily follow that a court, in the course of adjudicating a negligence cause of action, is barred from recognizing a distinction between negligent and grossly negligent conduct. This is particularly so if, as in the present case, it is necessary to make such a distinction in order to determine the applicability of a contractual provision that waives a landlord's liability for ordinary negligence but not for gross negligence.

As our Supreme Court has stated: "Connecticut does not recognize degrees of negligence and, consequently, does not recognize *the tort* of gross negligence as a separate basis of liability." (Emphasis added.) *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 337, 885 A.2d 734 (2005). Our Supreme Court "ha[s] never recognized degrees of negligence as slight, ordinary, and gross in the law of torts." (Internal quotation marks omitted.) *Matthiessen* v. *Vanech*, supra, 266 Conn. 833 n.10. Accordingly, if REC had asserted a cause of action sounding in gross negligence, and the court had permitted REC to recover on such a count, Commerce Park might have a viable appellate issue. That, however, is not how the present case was pleaded or adjudicated.

In the underlying tort action, REC pleaded counts sounding in negligence, common-law recklessness and a CUTPA violation. Consistent with our Supreme Court's statement in *Matthiessen*, under count one, the negligence count against Commerce Park, the court was permitted to award damages on the basis of acts or omissions that it determined fell within a full range of negligent behavior, including, but not limited to, acts of gross negligence. In other words, a cause of action

for negligence can encompass liability for any and all degrees of negligence, including gross negligence. Accordingly, it was not improper as a matter of law for the court in the present case to have awarded damages on the basis of a finding of gross negligence. Gross negligence, after all, is negligence.

More importantly, the concept of gross negligence was injected into the case by Commerce Park through its assertion at trial and in posttrial briefs that it could not be liable to REC because of the indemnification provision in the lease.[20] In the lease with Commerce Park, Robbins had agreed, on her own behalf and on behalf of REC, to indemnify Commerce Park for, inter alia, damages caused by the overflow of water or sewage into any part of the premises unless such damages were caused "by the gross negligence or willfulness" of Commerce Park or its agents. In order to rebut that assertion, it was incumbent upon Robbins to convince the court that Commerce Park's failure to take action to repair the known sewer problems rose beyond simple negligence to gross negligence. See *Atelier Constantin Popescu, LLC* v. *JC Corp.*, 134 Conn. App. 731, 738–40, 49 A.3d 1003 (2012) (upholding finding of gross negligence that was necessary for plaintiff to overcome negligence waiver in lease). Moreover, Commerce Park's argument, if valid, would render meaningless and unenforceable the very distinction to which the parties had agreed in the lease. See *Tinaco Plaza, LLC* v. *Freebob's, Inc.*, 74 Conn. App. 760, 767, 814 A.2d 403 (lease is contract and court must construe it in manner that gives effect to every provision), cert. granted, 263 Conn. 904, 819 A.2d 840 (2003) (motion to dismiss granted February 4, 2004). We simply are unpersuaded by Commerce Park's argument that it was improper for the court to have rendered judgment in favor of REC on its negligence count against Commerce Park on the basis of the court's determination that Commerce Park was grossly negligent.

2

Commerce Park also argues that it was improper for the court to have awarded damages on the basis of gross negligence because it was never pleaded by REC. We are not persuaded.

It is indisputable that the pleadings establish the framework of any legal action. "Generally, it is clear that [t]he court is not permitted to decide issues outside of those raised in the pleadings." (Internal quotation marks omitted.) *Lynn* v. *Bosco*, 182 Conn. App. 200, 213, 189 A.3d 601 (2018). "[I]t is imperative that the court and opposing counsel be able to rely on the statement of issues as set forth in the pleadings. . . . [A]ny judgment should conform to the pleadings, the issues and the prayers for relief. . . . [A] plaintiff may not allege one cause of action and recover upon another. . . . The requirement that claims be raised timely and

distinctly . . . recognizes that counsel should not have the opportunity to surprise an opponent by interjecting a claim when opposing counsel is no longer in a position to present evidence against such a claim." (Citations omitted; internal quotation marks omitted.) Id., 214–15. "That does not necessarily mean, however, that the absence of a particular claim from the pleadings automatically precludes a trial court from addressing the claim, because a court may, despite pleading deficiencies, decide a case on the basis on which it was actually litigated and may, in such an instance, permit the amendment of a complaint, even after the trial, to conform to that actuality. . . . Indeed, [our Supreme Court has] recognized that, even in the absence of such an amendment, where the trial court had in fact addressed a technically unpleaded claim that was actually litigated by the parties, it was improper for the Appellate Court to reverse the trial court's judgment for lack of such an amendment." (Citation omitted.) *Stafford Higgins Industries, Inc.* v. *Norwalk*, 245 Conn. 551, 575, 715 A.2d 46 (1998).

Any argument that the court acted outside the scope of the pleadings implicates its authority to act, which presents a question of law over which our review is plenary. *Lynn* v. *Bosco*, supra, 182 Conn. App. 213. Furthermore, "[t]he interpretation of pleadings is always a question of law for the court . . . ." (Internal quotation marks omitted.) *McLeod* v. *A Better Way Wholesale Autos, Inc.*, 177 Conn. App. 423, 444, 172 A.3d 802 (2017).

In support of the present argument, Commerce Park directs our attention to the operative complaint, noting that although REC alleged in count one that it was damaged by Commerce Park's negligence, REC failed to set forth any specific references to gross negligence in either count one or in its prayer for relief. According to Commerce Park, "[e]ven if this court concluded that the trial court had the power to find [that] the negligence waiver was operative and barred [Commerce Park's] negligence but not its gross negligence, the trial court erred in that [REC] never pleaded, raised or even argued that [Commerce Park] was grossly negligent."

Commerce Park's suggestion that the court went beyond the pleadings in awarding damages on the basis of gross negligence is simply unfounded on this record. First, REC recovered under a negligence theory that *was pleaded*. In considering whether Commerce Park was grossly negligent, the court simply adjudicated an issue, inserted into the case by Commerce Park, namely, whether REC was precluded from recovering under a negligence theory because of the indemnification clause in the lease. The court rejected Commerce Park's assertion in that regard. Thus, Commerce Park's argument that REC prevailed on a theory it did not plead borders on the frivolous. If any pleading irregularity occurred,

it arose out of Commerce Park's failure to allege the indemnification clause as a special defense to REC's negligence count. If Commerce Park had pleaded the indemnification clause as a special defense, REC would have had an opportunity to file a responsive pleading indicating that the conduct it alleged in the complaint rose to the level of gross negligence and, thus, the exculpatory provision did not apply. Furthermore, by raising the negligence waiver as a defense at trial, Commerce Park demonstrated that it fully understood that the issue of whether the facts alleged in the complaint rose to the level of gross negligence was an issue to be litigated and decided by the court. It addressed that issue fully in its posttrial brief, never raising any claim of pleading irregularity to the trial court. See *Tedesco* v. *Stamford*, 215 Conn. 450, 459, 576 A.2d 1273 (1990) ("a pleading defect cannot be a basis for setting aside a judgment unless it has materially prejudiced the defendant"); *Landry* v. *Spitz*, 102 Conn. App. 34, 43–44, 925 A.2d 334 (2007) ("in the context of a postjudgment appeal, if a review of the record demonstrates that an unpleaded cause of action actually was litigated at trial without objection such that the opposing party cannot claim surprise or prejudice, the judgment will not be disturbed on the basis of a pleading irregularity").

Second, we are not persuaded that the complaint is silent with respect to allegations of gross negligence. It is factually correct that REC never used the words "gross negligence" in the complaint. Nevertheless, in its negligence count against Commerce Park, REC incorporated detailed factual allegations describing the conduct of Commerce Park and RDR in response to the sewer backups. It is axiomatic that we must "construe pleadings broadly and realistically, rather than narrowly and technically. . . . Although essential allegations may not be supplied by conjecture or remote implication . . . the complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties. . . . As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient to allow recovery." (Internal quotation marks omitted.) *McLeod* v. *A Better Way Wholesale Autos, Inc.*, supra, 177 Conn. App. 444–45. Given that REC sought to recover on a theory of negligence, it was sufficient for REC to describe the acts or omissions it believed would support a determination of liability under that count. As we explained in part II A 1 of this opinion, general allegations of negligence are legally sufficient to encompass liability for any and all degrees of negligence, including gross negligence. In short, the record simply does not support Commerce Park's argument that there was a defect in the pleadings sufficient to warrant a reversal

and, accordingly, we reject that argument.

### B

Commerce Park's final claim challenges the court's calculation of the damages awarded to REC. Commerce Park's claim is, again, twofold. First, it argues that the court incorrectly determined that the proper measure of REC's damages was its loss of the beneficial use of the substantial improvements it had made to the premises prior to the constructive eviction. Second, it argues that, even if this was a proper measure of damages, the court miscalculated the amount of those damages because, in calculating the remainder of Robbins' tenancy under the lease, the court included unexercised options to extend the lease for two additional five year periods. We agree with the second argument only.

Our standard of review applicable to challenges to damages awards is well settled. As we have already stated, "[t]he trial court has broad discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous. . . . [If], however, a damages award is challenged on the basis of a question of law, our review [of that question] is plenary." (Citation omitted; internal quotation marks omitted.) *Landry* v. *Spitz*, supra, 102 Conn. App. 49–50. "[T]he burden of proving damages is on the party claiming them. . . . Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. . . . [T]he court must have evidence by which it can calculate the damages, which is not merely subjective or speculative . . . but which allows for some objective ascertainment of the amount. . . . This certainly does not mean that mathematical exactitude is a precondition to an award of damages, but we do require that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation [that] will enable the trier to make a fair and reasonable estimate." (Citations omitted; internal quotation marks omitted.) *Weiss* v. *Smulders*, 313 Conn. 227, 253–54, 96 A.3d 1175 (2014).

### 1

Commerce Park first argues that the court utilized the wrong measure of damages. It contends that rather than awarding damages on the basis of REC's loss of the use of improvements it had made to the premises, the court should have limited its award of damages to the loss of the fair market value of the lease. We conclude that the court utilized a proper measure of damages.[21]

Citing our Supreme Court's decision in *Gans* v. *Olchin & Co.*, 109 Conn. 164, 145 A. 751 (1929), Commerce Park urges us to hold that the proper measure of damages for a tenant constructively evicted from leased premises is limited to "the difference between

the rental value of the leased premises at the time of the eviction and the reserved rent for the unexpired period of the lease." Id., 168. Nothing in that opinion, however, states that this is the only appropriate measure of damages in every case of constructive eviction.

It is axiomatic that the purpose of compensatory damages is "to restore an injured party to the position he or she would have been in if the wrong had not been committed." (Internal quotation marks omitted.) *Rizzuto* v. *Davidson Ladders, Inc.*, 280 Conn. 225, 248, 905 A.2d 1165 (2006). In deciding whether the court utilized a proper measure for determining compensatory damages in the present case, we find the rule set forth in the Restatement (Second) of Property both instructive and persuasive. Section 10.2 of the Restatement (Second) of Property sets forth the following rule for determining damages: "If the tenant is entitled to recover damages from the landlord for his failure to fulfill his obligations under the lease, absent a valid agreement as to the measure of damages, damages *may include one or more of the following items as may be appropriate so long as no double recovery is involved*:

"(1) if the tenant is entitled to terminate the lease and does so, the fair market value of the lease on the date he terminates the lease;

"(2) *the loss sustained by the tenant due to reasonable expenditures made by the tenant before the landlord's default* which the landlord at the time the lease was made could reasonably have foreseen would be made by the tenant;

"(3) if the tenant is entitled to terminate the lease and does so, reasonable relocation costs;

"(4) if the lease is not terminated, reasonable additional costs of substituted premises incurred by the tenant as a result of the landlord's default while the default continues;

"(5) if the use of the leased property contemplated by the parties is for business purposes, loss of anticipated business profits proven to a reasonable degree of certainty, which resulted from the landlord's default, and which the landlord at the time the lease was made could reasonably have foreseen would be caused by the default;

"(6) if the tenant eliminates the default, the reasonable costs incurred by the tenant in eliminating the default; and

"(7) interest on the amount recovered at the legal rate for the period appropriate under the circumstances." (Emphasis added.) 1 Restatement (Second), Property, Landlord and Tenant § 10.2, pp. 338–39 (1977).

Subsection (1) of § 10.2 of the Restatement (Second) of Property is, in essence, equivalent to the measure of damages discussed in *Gans* v. *Olchin & Co.*, supra, 109

Conn. 168. The Restatement rule, however, leaves it to the court's discretion to choose from any one or more of the enumerated items in crafting a compensatory damages award, providing only that the court must ensure that it does not permit double recovery.

In its posttrial brief, REC claimed entitlement to damages totaling more than four million dollars on the basis of lost business profits and its loss of use of substantial improvements it had made to the premises. Those components correspond, respectively, with subsections (5) and (2) of the rule set forth in § 10.2 of the Restatement (Second) of Property. The court found that REC had failed to prove its lost profits claim with reasonable certainty but was able to make a fair estimate of the value of REC's loss of its improvements. Consistent with § 10.2 of the Restatement (Second) of Property, we conclude that the court properly considered REC's loss of use of improvements as a component of the damages awarded to REC.[22]

### 2

Commerce Park further argues, however, that even if the court properly included REC's loss of the beneficial use of its improvements as a component of the overall damages award, the court, in calculating the amount of damages for loss of use, improperly determined the length of Robbins' expected tenancy under the lease, which increased the amount of the damages awarded for the loss of use. More specifically, according to Commerce Park, the court improperly included in its calculations the two unexercised options to extend the lease for a term of five years each, and this error resulted in excessive damages awarded to REC. We agree that the court improperly included the two option periods in calculating damages.

As previously set forth, the determination of damages generally involves a question of fact that we will not overturn absent a showing that the resulting award is clearly erroneous, meaning it is unsupported by evidence in the record or, if supported, we are left with a definite and firm conviction that a mistake has been made. See *Benedetto* v. *Wanat*, supra, 79 Conn. App. 147. In the present case, however, our review of the damages awarded turns largely on our construction of the option clause in the parties' lease. "[A] lease is a contract," and, thus, our rules governing the construction of contracts apply. *Bristol* v. *Ocean State Job Lot Stores of Connecticut, Inc.*, 284 Conn. 1, 7, 931 A.2d 837 (2007). "[W]e accord the language employed in the contract a rational construction based on its common, natural and ordinary meaning and usage as applied to the subject matter of the contract. . . . [If] the language is unambiguous, we must give the contract effect according to its terms." (Internal quotation marks omitted.) *Kaplan* v. *Scheer*, 182 Conn. App. 488, 496, 190 A.3d 31, cert. denied, 330 Conn. 913, 193 A.3d 49 (2018).

Accordingly, "[if] a party's intent is expressed clearly and unambiguously in writing . . . the determination of what the parties intended . . . is a question of law [over which our review is plenary]." (Internal quotation marks omitted.) *19 Perry Street, LLC* v. *Unionville Water Co.*, supra, 294 Conn. 622–23.

The following facts are relevant to our discussion. The lease commenced on August 1, 2007. In order to transform the premises into "a state-of-the-art eye care center," Robbins made significant improvements to the premises that were substantially completed by the end of 2009. The lease had a definite, initial term of fifteen years, meaning it was set to expire on July 31, 2022. The lease, however, also contained a provision that provided Robbins with the option of extending the lease for two additional five year periods upon timely written notice to Commerce Park. Specifically, paragraph 3 of the lease, titled "Option Terms," states in relevant part: "*Provided that Tenant shall have complied with each and every obligation hereunder, and shall not be in default of any provision of this Lease*, then Tenant shall have two (2) successive options to extend this Lease (individually, an 'Option'), each for a term of five (5) years (individually, an 'Option Term'), upon the same terms and conditions herein set forth . . . . These Options shall be exercised by delivery of written notice from Tenant to Landlord, which notice must be received by Landlord not less than six (6) months prior to the expiration of the Term or Option Term (as applicable) then existing." (Emphasis added.)

Accordingly, Commerce Park had no right to refuse the options to extend the lease "[p]rovided that" Robbins met the stated conditions, including that she complied with all of her obligations under the lease. Robbins testified at trial that, at the time she signed the lease in 2007, she had no intention of moving her practice. Robbins and REC vacated the premises at the end of June, 2015, before the expiration of the lease's initial term and without having exercised any option to extend the lease beyond 2022.

To calculate the dollar value to assign to REC's loss of the use of the improvements it made to the premises, the trial court utilized the following formula: the percentage of time that REC had lost the use of its improvements, calculated by comparing the length of time of actual use against the time that REC would have enjoyed under the lease had Robbins not been constructively evicted, multiplied by the cost of the improvements. In applying that formula, the court stated: "Here, as of April, 2015, REC had used the improvements to the [premises] for five years and four months out of a twenty-two year term (ten years after the completion of the improvements *plus two five year options*). Therefore, REC's damages are 75.8 percent of the improvement cost, which totals $899,190 ($1,186,267 x 75.8 per-

cent)."[23] (Emphasis added.) Commerce Park does not challenge the formula used by the court but argues only that it was improper for the court to have included the two unexercised option periods in its calculations.

The record supports a finding that Robbins would have sought to exercise the options. Robbins testified at trial that there were "many reasons that made [the premises] very attractive" to Robbins and her practice. She also indicated that "each time you move a practice you lose a percentage of patients . . . ." Further, soon after she decided to renew her lease with Commerce Park in 2007, Robbins expended a considerable sum of money to hire contractors to fit out the premises for use as a state-of-the-art surgical facility. When asked if she had any intention of moving her business at the time she executed the 2007 lease, Robbins responded that she "had no intention of moving the operating rooms or the practice." She also answered in the negative when asked if she ever intended to practice medicine at any location other than the premises, stating, "I was planning on staying there for my entire career." Thus, it was reasonable for the court to have inferred from Robbins' testimony that, absent the type of problems that later arose, she would have remained there for the full extent of the lease and that, in deciding to invest in significant improvements to the premises, Robbins would have considered the cost in light of the full potential time span that she and REC expected to utilize the improvements, which would have included the option periods. It was a pure factual determination for the court whether Robbins reasonably would have exercised one or both options if Commerce Park had not constructively evicted her and REC.

A finding that Robbins likely would have sought to exercise the options had she and REC remained in the premises, however, does not completely answer the question of whether those option periods were properly considered by the court in assessing damages. The right to exercise the option was expressly conditioned on Robbins having "complied with each and every obligation" of the lease and not being "in default of any provision" of the lease. By using clear and unambiguous language that the option could be exercised "[p]rovided that" the stated conditions were met, the parties signaled their intent to create a condition precedent. See *EH Investment Co., LLC* v. *Chappo, LLC*, 174 Conn. App. 344, 360–62, 166 A.3d 800 (2017) (discussing legal parameters of contractual conditions). If a condition precedent to an option clause in a lease is not met, then the right to exercise the option is extinguished. See *Brauer* v. *Freccia*, 159 Conn. 289, 293–94, 268 A.2d 645 (1970) (lessees' failure to pay rent for eight months defeated their right to exercise option in lease to purchase leased premises conditioned on lessees duly and punctually fulfilling all conditions of lease).

In adjudicating the rent action, the court expressly found that Robbins' "[f]ailure to pay the full rental for [five and three-quarter months] was a breach of the lease . . . ." Accordingly, under any reasonable metric, Robbins had not complied with each and every obligation under the lease.[24] If a condition precedent to an option does not occur, the option does not exist. See *Brauer* v. *Freccia*, supra, 159 Conn. 294. Said another way, Robbins' breach of the lease would have precluded her from exercising her option to extend the lease as a matter of law.

The court provided no explanation for including the unexercised option periods in its calculation.[25] We note, however, that the Superior Court decision on which the court relied as a template for both awarding damages for loss of use and determining the method for calculating those damages also included an option period in its calculation of the length of the expected tenancy in that case. See *31 Tobey Road, Ltd.* v. *Wright*, Superior Court, judicial district of Hartford, Docket No. CV-13-5001318-S (August 16, 2016). In that case, however, unlike the present case, although the tenant had stopped paying rent, the court did not find the tenant in breach of the lease. Further, the court in *31 Tobey Road, Ltd.*, did not set forth the terms of the option agreement in that case, and, therefore, there is no way of determining whether the option to extend was subject to a similar condition precedent.

REC argues on appeal that the court properly included the option periods in calculating damages despite Robbins' nonpayment of rent. First, REC argues that Robbins began to withhold a portion of the rent only after the September, 2013 flood caused by the downspout that detached from the roof drain, and that the court found this withholding was justified due to the impact on REC's business. This argument ignores, however, the court's ruling in part in favor of Commerce Park in the rent action. In so doing, the court expressly found that the withholding of rent was *not* justifiable once REC had repaired the damage caused by the flooding and that Robbins breached the lease by continuing to make reduced rent payments for the five and three-quarter months prior to the constructive eviction.

Second, REC argues that, despite the withholding of rent, Commerce Park never terminated the lease or sought to evict Robbins and REC. That fact alone, however, does not change the legal significance of Robbins' breach of the lease as it related to extinguishing her right to exercise the lease option. There is no language in the option provision or elsewhere in the lease that required Commerce Park to seek to terminate the lease in response to a breach by Robbins in order to avoid waiving the agreed upon condition precedent of the option provision.

On the basis of the record before us, we conclude that the court improperly included the two unexercised option periods in calculating the expected length of the tenancy because doing so was legally inconsistent with the express terms of the lease and its finding that Robbins breached the lease. Because the record contains all of the facts necessary to determine the proper amount of damages, it is unnecessary to remand the matter for a new hearing in damages to calculate the amount of damages due to REC on the basis of its loss of use of its improvements. On the basis of the trial court's findings, after the improvements were completed, REC had use of those improvements for five years and four months out of the twelve years and seven months remaining of the fifteen year original lease term. Under the formula utilized by the court, REC, therefore, is entitled to 57.6 percent of the cost of improvements, or $683,289.79. Added to the additional damages awarded, the total damages award in the tort action is $741,847.34.

In AC 41398, the judgment is reversed only with respect to the court's calculation of damages, and the matter is remanded for a new hearing limited to a determination of the amount of rent owed by Robbins to Commerce Park; the judgment is affirmed in all other respects. In AC 41543, the judgment is reversed only with respect to the amount of damages awarded and the case is remanded with direction to render judgment in favor of REC in the amount of $741,847.34; the judgment is otherwise affirmed.

In this opinion the other judges concurred.

[1] To avoid confusion, we will refer to the parties throughout this opinion by their names rather than their party designations, which differed in the underlying actions.

[2] Although Commerce Park and RDR jointly filed their appeal in the tort action, the claims on appeal are raised solely by Commerce Park.

[3] The court ruled in favor of RDR on all counts, and REC has not challenged that aspect of the judgment in the tort action on appeal.

[4] The parties filed a joint trial management report in which they set forth a detailed list of facts that they stipulated were not in dispute.

[5] The lease provided for yearly increases in the base rental rate tied to the consumer price index. The monthly basic rental payments during the time period for which Commerce Park sought unpaid rents ranged from $18,613.23 to $18,929.83.

[6] The parties stipulated in their joint trial management report that the contractor hired by REC to remodel the premises was paid $1,035,479, which the court found "probably does not include the full cost of fitting out the operating rooms, which Robbins estimated cost in excess of $1,000,000." In calculating damages for loss of use of the improvements, however, the court opted to use the improvement cost listed on REC's tax return of $1,186,267, "rather than the unsubstantiated and unsupported $2,000,000 improvement cost estimated by Robbins or the lower contractor cost stipulated by the parties."

[7] The court found that, although the roof was in poor condition and likely leaked, the September, 2013 incident was not the result of poor maintenance or a failure to repair the roof or failing components.

[8] In its recitation of the facts, the court states that, after October, 2014, when REC reoccupied the previously untenantable portions of the premises, the optical shop and LASIK center remained closed. That statement arguably conflicts with the court's determination that there was no basis for REC to have continued with its reduction in rent for the period beginning in Novem-

ber, 2014, until the sewer incursions commenced at the end of April, 2015. Robbins, however, does not raise this potential misstatement in support of her claim that the court improperly awarded Commerce Park full rent for that period. We limit our review to the arguments as raised and framed by the parties, which are that the former administrative office space remained unusable as office space during the more than five month period prior to the first sewage backup, and that the inability to use the office space justified Robbins' continued withholding of rent.

[9] The court additionally found that "[a]fter REC abandoned the [premises], there is no evidence of any repairs or remediation efforts by RDR or [Commerce Park] other than to snake the line to remove the specific clog that caused the backup. There was no evidence of any repairs to the sewer system in response to the June 29, 2015 notice of violation, although there is evidence the [premises were] cleaned and the specific clog was removed. If there were repairs, they were not done by the outside sewer contractor. What work was done was likely [performed] by RDR's maintenance personnel. There is no evidence the [premises were] fit to be occupied after the June 29, 2015 incident, and apparently, the entire lower floor was left vacant. In October, November and December, 2016, while the lower space was vacant and its fixtures unused, there were other major problems with the sewer system, as sewage once again backed up into the [premises]." (Footnote omitted.)

[10] The court noted that there was no evidence that Commerce Park ever remedied the problems with the building's sewer system even after REC vacated the premises and that Commerce Park had engaged in only "a sporadic and desultory effort to market the [premises]."

[11] The court indicated that although the leaks caused by toilets overflowing on upper floors were disruptive, they did not provided a valid basis for the abatement of rent because they were not severe enough to support a finding that the premises were rendered untenantable, either in whole or in part.

[12] The court reasoned: "[Commerce Park] probably anticipated there would be a sewer backup from time to time that either its maintenance crew or its sewer contractor could handle. [Commerce Park] probably did not anticipate the devastating series of sewage floods in the spring and summer of 2015 that culminated in the [premises] being shut down by the health department in late June, [2015]. [Commerce Park's] failure to remedy the defects in the sewer pipes within a reasonable period after the April, 2015 video inspection revealed multiple sags in the main sewer line and its failure to thoroughly clean the [premises] after the floods leading to mold infestation would be reckless conduct, but by that time, REC had already vacated the [premises] and, so, has no claim."

[13] Whether Connecticut should abandon the "cigarette rule" as the appropriate standard for determining unfairness under CUTPA in light of the federal courts' abandonment of that rule in favor of the "substantial unjustified injury test" remains an open question. *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 317 Conn. 602, 622 n.13, 119 A.3d 1139 (2015). That issue, however, is not before us in the present appeals and cross appeal.

[14] Subsequent to judgment, REC also sought and was granted a prejudgment remedy of attachment against Commerce Park. The prejudgment remedy later was modified and is the subject matter of a separate appeal by Commerce Park (AC 42375).

[15] We note that Robbins and REC never filed a motion for articulation nor did they challenge the court's determination regarding back rent in REC's postjudgment motion for reargument and reconsideration.

[16] The court found that the intended use of the premises was as "a medical office and operating rooms."

[17] November, 2014, through April, 2015, represents a period of six calendar months. Although the court indicates in its memorandum that it multiplied the monthly rent by five and then subtracted one-quarter month's rent in order to properly account for the last week of April, 2015, the numbers used by the court demonstrate that it correctly used a period of six months, less one week, in calculating the amount of unpaid rent at issue.

[18] Nothing in our discussion of the evidence should be construed as binding on the trial court that makes the final determination of the correct amount of damages to award on remand. We discuss the evidence only to illustrate why we firmly and definitely believe that the court made a mistake in its calculation of damages.

[19] Although Commerce Park points to other testimony that it believes indicates that Robbins had decided to leave prior to the first sewage backup, the trial court, as the trier of fact, was "free to weigh conflicting evidence

and to accept some, all or none of the testimony that [was] before it." *Stein* v. *Tong*, 117 Conn. App. 19, 30, 979 A.2d 494 (2009). Thus, the mere presence of conflicting evidence will not suffice to render a court's factual findings clearly erroneous; rather, there must be an absence of supporting evidence.

[20] Commerce Park never raised the indemnification provision as a special defense to the negligence count. See part II A 2 of this opinion. Rather, the issue was first asserted before the court during the direct examination of Commerce Park's principal, Robert Russo.

[21] REC argues that Commerce Park waived its right to raise this claim because it was not raised at trial or in the motion for reargument and reconsideration filed by Commerce Park and RDR. We do not agree.

[22] We note that appellate courts in other jurisdictions have relied on subsection (2) of § 10.2 of the Restatement (Second) of Property and its accompanying commentary in affirming an award of damages to a commercial tenant on the basis of loss of use of leasehold improvements following a constructive eviction. See, e.g., *Reisterstown Plaza Associates* v. *General Nutrition Center, Inc.*, 89 Md. App. 232, 240, 597 A.2d 1049 (1991).

[23] As previously indicated, the court found that the improvements were completed by the end of December, 2009. Therefore, when Robbins was constructively evicted at the end of April, 2015, REC had used the improvements it made to the premises for a period of approximately five years and four months, as indicated by the court. The court further indicated that this period of use was "out of a twenty-two year term," which, as set forth in the parenthetical that follows, included the two five year option periods. In order for the math to work, the court necessarily must have computed that twelve years remained of the original fifteen year lease term after the improvements were completed, not ten years as the court stated in the parenthetical. Further, it is manifest from the percentage used by the court in its mathematical calculation that it used a twelve year period rather than a ten year period in determining the total potential period for which REC would have had use of the improvements. Nevertheless, on the basis of the dates found by the court, we calculate that twelve years and seven months remained under the original fifteen year lease term after the improvements were completed. Accordingly, we use twelve years and seven months in our recalculation of the damages owed to REC for loss of use.

[24] In *Pack 2000, Inc.* v. *Cushman*, 311 Conn. 662, 680, 89 A.3d 869 (2014), the Supreme Court clarified that "when an option is conditioned on a lessee's compliance with a lease, in the absence of explicit contractual language to the contrary, a substantial rather than strict compliance standard applies so that, if the lessee is not in material breach of the lease when he seeks to exercise the option and has not previously been defaulted under the terms of the lease, the option is enforceable against the lessor." Under the circumstances of the present case, there can be no doubt that Robbins' decision to pay only one half of the rent due under the lease for a period of more than five months was a material breach of the lease.

[25] We note that this issue was directly raised to the court by Commerce Park in the motion for reconsideration and reargument filed by Commerce Park and RDR. Commerce Park argued that "the [c]ourt's finding that the tenant owed full rent for a period of five and three-quarter months constitutes a finding that the tenant was in default, which alone would preclude the exercise of the option. In the absence of proof that the conditions precedent for exercise of the options were met, the options can never be operative." The court denied the motion without acknowledging or addressing Commerce Park's argument.

———————————————